**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| Bryan S. Ross, Chapter 7 Trustee )<br>Plaintiff, )<br>v. )<br>Continental Casualty Company )<br>Defendant. ) | Case: 1:07-CV-01450<br><br>Assigned to: Roberts, Richard W.<br><br>Assign Date: 8/10/2007<br><br>Description: Contract |

**DEFENDANT CONTINENTAL CASUALTY COMPANY'S
MOTION FOR JUDGMENT ON THE PLEADINGS, OR IN
THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT**

Defendant Continental Casualty Company ("Continental"), by and through its undersigned counsel, hereby moves for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), or in the alternative, for summary judgment pursuant to Fed. R. Civ. P. 56. As set forth in the materials accompanying this motion, there are no material facts in dispute and Continental is entitled to judgment as a matter of law.

Filed with this motion, and incorporated by reference herein, are the following:

- Defendant Continental Casualty Company's Statement of Material Facts as to Which There is No Genuine Dispute;

- Memorandum of Points and Authorities in Support of Continental Casualty Company's Motion for Judgment on the Pleadings, or in the Alternative, Motion for Summary Judgment;

- Declaration of Kelly V. Overman in Support of Continental Casualty Company's Motion for Judgment on the Pleadings, or in the Alternative, Motion for Summary Judgment, and

- Proposed Order

WHEREFORE, Defendant Continental respectfully requests that this Court grant its Motion for Judgment on the Pleadings, or in the Alternative, Motion for Summary Judgment.

363530v1

## REQUEST FOR ORAL ARGUMENT

Continental believes that oral argument may assist the Court and wishes to be heard.

Respectfully submitted,

ROSS, DIXON & BELL, LLP

Dated: January 30, 2008       By: /s/ Kelly V. Overman
               Richard A. Simpson
               (D.C. Bar No. 411893)
               Kelly V. Overman
               (D.C. Bar No. 482077)
               2001 K Street, N.W.
               Washington, D.C. 20006
               Telephone: (202) 662-2000
               Facsimile: (202) 662-2190

               *Counsel for Plaintiff*
               *Continental Casualty Company*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| Bryan S. Ross, Chapter 7 Trustee ) <br> ) Plaintiff, ) <br> ) <br> v. ) <br> ) <br> Continental Casualty Company ) <br> ) Defendant. ) | Case: 1:07-CV-01450 <br><br> Assigned to: Roberts, Richard W. <br><br> Assign Date: 8/10/2007 <br><br> Description: Contract |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CONTINENTAL CASUALTY COMPANY'S MOTION FOR JUDGMENT ON THE PLEADINGS, OR IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

Richard A. Simpson
(D.C. Bar No. 411893)
Kelly V. Overman
(D.C. Bar No. 482077)
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 662-2000
Facsimile: (202) 662-2190

*Counsel for Plaintiff Continental Casualty Company*

**TABLE OF CONTENTS**

Table of Authorities................................................................................................ii

I.       INTRODUCTION ........................................................................................ 1

II.      STATEMENT OF UNDISPUTED MATERIAL FACTS............................. 2

         A.      The Underlying Action ..................................................................... 2

         B.      After RESD Filed For Bankruptcy, a Trustee was Appointed, who Filed
                 the Malpractice Suit......................................................................... 3

         C.      The Policy ......................................................................................... 4

III.     ARGUMENT ............................................................................................... 6

         A.      Standard for Judgment on the Pleadings and for Summary Judgment.................. 6

         B.      Policy Section I.A.3 Unambiguously Bars Coverage for the Malpractice
                 Lawsuit ............................................................................................. 7

IV.      CONCLUSION............................................................................................ 14

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Ann Arbor Public Schools v. Diamond State Insurance Co.*,
   236 F. App'x 163 (6th Cir. 2007) .............................................................. 7

*Brander v. Nabors*,
   443 F. Supp. 764 (N.D. Miss.), *aff'd*, 579 F.2d 888 (5th Cir. 1978) ........................ 13

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ..................................................................... 6

*Continental Casualty Co. v. Graham & Schewe*,
   339 F. Supp. 2d 723 (E.D. Va. 2004) ...................................................... 10

*Coregis Insurance Co. v. Baratta & Fenerty, Ltd.*,
   264 F.3d 302 (3d Cir. 2001), *aff'g* 57 F. Supp. 2d 179 (E.D. Pa. 1999) ................... 12

*Coregis Insurance Co. v. Wheeler*,
   24 F. Supp. 2d 475 (E.D. Pa. 1998) ...................................................... 12

*\*Culver v. Continental Insurance Co.*,
   11 F. App'x 42 (4th Cir. 1999) ...................................................... 8, 10

*Hartford Accident & Indemnity Co. v. Pro-Football, Inc.*,
   127 F.3d 1111 (D.C. Cir. 1997) ........................................................... 7

*Home Indemnity Co. v. Toombs*,
   910 F. Supp. 1569 (N.D. Ga. 1995) ................................................... 12, 13

*Horsley v. Rivera*,
   292 F.3d 695 (11th Cir. 2002) ............................................................ 6

*International Surplus Lines Insurance Co. v. University of Wyoming Research Corp.*,
   850 F. Supp. 1509 (D. Wyo. 1994), *aff'd sub nom. International Surplus
   Lines Insurance Co. v. Wyoming Coal Refining System Corp.*,
   52 F.3d 901 (10th Cir. 1995) ............................................................ 10

*Maniaci v. Georgetown University*,
   510 F. Supp. 2d 50 (D.D.C. 2007) ........................................................ 6

*\*Minnesota Lawyers Mutual Insurance Co. v. Hahn*,
   C.A. No. 04-0640, 2004 U.S. Dist. LEXIS 24689 (D.D.C. Dec. 9, 2004) ................... 9

*Mt. Airy Insurance Co. v. Thomas*,

954 F. Supp. 1073 (W.D. Pa. 1997), *aff'd*, 149 F.3d 1165 (3d Cir. 1998) ................ 13

*National Union Fire Insurance Co. v. Mason, Perrin & Kanovksy,*
765 F. Supp. 15 (D.D.C. 1991) ................................................................... 9

*Professional Managers, Inc. v. Fawer, Brian, Hardy & Zatzkis,*
799 F.2d 218 (5th Cir. 1986) ................................................................... 10

*Rubins Contractors, Inc. v. Lumbermens Mutual Insurance Co.,*
821 F.2d 671 (D.C. Cir. 1987) ................................................................... 7

*Skinner v. Aetna Life & Casualty,*
804 F.2d 148 (D.C. Cir. 1986) ................................................................... 9

*Stonehenge Engineering Corp. v. Employers Insurance of Wausau,*
201 F.3d 296 (4th Cir. 2000) ................................................................... 8

*Truck Insurance Exchange v. Ashland Oil, Inc.,*
951 F.2d 787 (7th Cir. 1992) ............................................................. 7, 8

*United States ex rel. Miller v. Bill Harbert International Construction, Inc.,*
505 F. Supp. 2d 20 (D.D.C. 2007) ................................................................ 6

*Westport Insurance Corp. v. Albert,*
208 F. App'x 222 (4th Cir. 2006) ............................................................. 8

*Westport Insurance Corp. v. Lilley,*
292 F. Supp. 2d 165 (D. Me. 2003) ......................................................... 11


### STATE CASES

*Chase v. State Farm Fire & Casualty Co.,*
780 A.2d 1123 (D.C. 2001) ................................................................... 7

*\*Fogelson v. Home Insurance Co.,*
129 A.D.2d 508 (N.Y. App. Div. 1987) ............................................... 12, 13

*Restaurant Equipment & Supply Depot, Inc. v. Gutierrez,*
852 A.2d 951 (D.C. 2004) ................................................................. 3, 11

*Sharp v. Wood,*
No. 01-CA-2184, 2004 WL 1835012 (D.C. Super. Ct. 2004) .................................... 9

*Terrell, Thorpe & Findlay, Inc., P.S. v. Continental Insurance Co.,*
  825 P.2d 724 (Wash. Ct. App. 1992) ...................................................... 13

*West v. United States,*
  866 A.2d 74 (D.C. 2005) ............................................................................ 9

*\*Wittner, Poger, Rosenblum & Spewak v. Bar Plan Mutual Insurance Co.,*
  969 S.W.2d 749 (Mo. 1998) ...................................................................... 12

*Zuckerman v. National Union Fire Insurance Co.,*
  495 A.2d 395 (N.J. 1985) ........................................................................... 8

## DOCKETED CASES

*Ross, Trustee in Bankruptcy for Restaurant Equipment & Supply Depot, Inc. v.*
  *The Law Offices of Stanley H. Goldschmidt, P.C.,*
  Case No. 05-01316 (Bankr. D.C.) ............................................................. 1

## FEDERAL STATUTES

Fed. R. Civ. P. 12(c) ........................................................................................ 6

Fed. R. Civ. P. 56(c) ........................................................................................ 6

## STATE STATUTES

D.C. Code Ann. §35-414 (1981) ...................................................................... 8

## SECONDARY SOURCES

5 Ronald E. Mallen & Jeffrey M. Smith, Legal Malpractice § 34:14 (2007 ed.).......*passim*

# I.
## INTRODUCTION

The Complaint and Counterclaim in this action present a dispositive threshold issue as to which the facts are undisputed: whether Lawyers Professional Liability Policy No. LAW 267870255 (the "Policy"), issued by Continental Casualty Company ("Continental") to the Law Offices of Stanley H. Goldschmidt, P.C. (the "Firm"), provides coverage for the legal malpractice claims asserted by bankruptcy trustee Bryan S. Ross in the lawsuit styled *Ross, Trustee in Bankruptcy for Restaurant Equipment & Supply Depot, Inc. v. The Law Offices of Stanley H. Goldschmidt, P.C.*, Case No. 05-01316, in the United States Bankruptcy Court for the District of Columbia (the "Malpractice Lawsuit"). A true and correct copy of the Policy is attached to the accompanying declaration of Kelly V. Overman (the "Overman Declaration") as Exhibit A. A true and correct copy of the Complaint in the Malpractice Lawsuit is attached to the Overman Declaration as Exhibit B.

The Policy's basic insuring agreement expressly bars coverage where, prior to the inception date of the first Policy issued by Continental to the Firm, any Insured had a basis to believe that any act or omission "might reasonably be expected to be the basis of a claim." Here, it is indisputable that prior to the first inception date, Mr. Goldschmidt knew that: (1) he had failed to file timely an answer on behalf of his Firm's client; (2) as a result of this failure, default judgment had been entered against his Firm's client; (3) the trial court had denied his motion to vacate the default judgment; (4) the trial court likewise had denied his motion for reconsideration of its denial; (5) after a trial on damages only (because defense to liability had been foreclosed), the trial court had entered judgment against his Firm's client for over $800,000; and (6) he had filed an appeal with the D.C. Court of Appeals on May 15, 2001, challenging the pending trial court's default ruling. Based on the clear Policy terms and the insured's undisputed knowledge

of the foregoing, Continental seeks a declaratory judgment that the Policy does not provide coverage for the Malpractice Lawsuit as a matter of law.

## II.
## STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.    The Underlying Action

Restaurant Equipment & Supply Depot, Inc. ("RESD") retained Stanley H. Goldschmidt to defend it against an employment lawsuit filed in February 2000 in the Superior Court for the District of Columbia (the "Underlying Litigation").  Counterclaim of Continental Casualty Company ("Counterclaim") at ¶ 8; Reply of Bryan S. Ross ("Reply") at ¶ 8 (collectively, the Counterclaim and Reply are hereafter referred to as the "Pleadings").  On behalf of RESD, on May 5, 2000, Mr. Goldschmidt filed a motion to dismiss the Underlying Litigation, which the trial court denied on September 11, 2000.  Pleadings, ¶ 9.  That denial triggered RESD's obligation to file a timely answer, but the Firm failed to file an answer on behalf of RESD.  Pleadings, ¶ 10.  When no answer was filed, the plaintiffs in the Underlying Litigation sought entry of a default judgment on December 11, 2000.  Pleadings, ¶ 12.

On January 2, 2001, the trial court entered an Order of Default as to liability against RESD and set the case for a damages hearing on February 16, 2001.  Pleadings, ¶ 13.  On January 17, 2001, Mr. Goldschmidt filed a motion to vacate the default judgment, which the Court denied on February 14, 2001.  Pleadings, ¶ 14.  When that was unsuccessful, on March 7, 2001, Mr. Goldschmidt filed a Motion for Reconsideration of the Entry of Judgment by Default, which the Court denied on April 12, 2001.  Pleadings, ¶ 15.

Beginning on April 23, 2001, the trial court held a jury trial on damages.  Pleadings, ¶ 17.  On May 1, 2001, the court entered judgment against RESD on the jury verdict in excess of $800,000.  Pleadings, ¶ 18.  Thereafter, the plaintiffs in the Underlying Litigation filed a motion

for attorneys' fees and costs, which was granted.  Pleadings, ¶ 19.  Mr. Goldschmidt filed a

notice of appeal on behalf of RESD on May 16, 2001, submitted briefs, and attended oral

argument on April 22, 2004.  Pleadings, ¶ 20.  On July 1, 2004, the District of Columbia Court of

Appeals affirmed the trial court's ruling.  Pleadings, ¶ 22; *Rest. Equip. & Supply Depot, Inc. v.*

*Gutierrez*, 852 A.2d 951 (D.C. 2004) (the "Court of Appeals Opinion").  A true and correct copy

of the Court of Appeals Opinion is attached to the Overman Declaration as Exhibit C.

In the RESD appellate brief, Mr. Goldschmidt asserted a number of excuses for the

Firm's failure to file the answer timely.  The Court of Appeals decision in the Underlying

Litigation cites several of these excuses:

> (1) they were short-staffed because one of their associates left the firm during the
> litigation; (2) they inadvertently failed to "calendar" the due date for the answer;
> (3) appellee's failed to notify them that their answer was delinquent between
> September 29, 2000 and December 11, 2000; (4) they *forgot* about the answer
> during the long pendency of their motion to dismiss; and (5) they were unable to
> contact their clients during the holiday season and were unable to finish the
> answer.

Court of Appeals Opinion, at 957, n.7 (emphasis added).  On July 15, 2004,

Mr. Goldschmidt filed a Petition for *En Banc* Review with the District of Columbia Court

of Appeals, which the appeals court denied on October 28, 2004.  Pleadings, ¶ 23.

Accordingly, the default was never lifted.

**B.    After RESD Filed For Bankruptcy, a Trustee was Appointed, who Filed the
Malpractice Suit**

On September 2, 2005, RESD filed a voluntary petition for bankruptcy under Chapter 7

of the Bankruptcy Code.  Pleadings, ¶ 26.  Bryan S. Ross was appointed as the trustee of the

RESD bankruptcy estate (the "Trustee").  Pleadings, ¶ 27.  By letter dated January 6, 2006, the

Trustee advised Mr. Goldschmidt that he believed that the bankruptcy estate possessed a legal

malpractice claim against Mr. Goldschmidt and the Firm.  Pleadings, ¶ 28.  On February 17,

2006, the Trustee filed the Malpractice Lawsuit as an adversary pleading in the bankruptcy case. Pleadings, ¶ 29. Judgment was entered against Mr. Goldschmidt in the Malpractice Lawsuit in the amount of $909,277.98 plus interest. Pleadings, ¶ 31.

Mr. Goldschmidt, the Firm, and the Trustee entered into a dubious settlement of the Malpractice Lawsuit, pursuant to which the Mr. Goldschmidt paid only $60,000 and the Trustee obtained an assignment of the Firm's rights under the Policy.[1] Pleadings, ¶ 32. Continental did not provide its written consent to the assignment, as required by the Policy. Pleadings, ¶ 33; Policy, Ex. A. at § V.K.

C.    **The Policy**

Continental issued the claims made and reported Policy to the Firm for the policy period May 1, 2005 to May 1, 2006. *Id.* at ¶ 34. However, the Policy was cancelled as of July 1, 2005. *Id.* The Firm purchased an extended reporting period upon cancellation of the policy, and the Malpractice Lawsuit is a claim reported under the extended reporting period. *Id.* at ¶ 34-35. The Policy is a renewal of the first policy issued by Continental to the Firm. *Id.* at ¶ 36. The first policy issued by Continental (or any subsidiary or affiliate of Continental) to the Firm was issued for the May 1, 2003 to May 1, 2004 policy period (the "First Policy"). *Id.*

Subject to all of the Policy's terms and conditions, the Policy's basic insuring agreement provides coverage for:

> all sums in excess of the deductible that the **Insured** shall become legally obligated to pay as **damages** and **claim expenses** because of a **claim** that is both first made against the **Insured** and reported in writing to the **Company** during the **policy period** by reason of an act or omission in the performance of

---

[1] Because Continental believes this matter can be resolved wholly on the threshold coverage issue discussed in this brief, it has not addressed in this motion its concerns that this agreement was not negotiated at arm's length.

**legal services** by the **Insured** or by any person for whom the **Insured** is legally liable . . .

Exhibit A, Policy, § I.A.  Moreover, the Policy provides that Continental's duty to pay sums on

behalf of an Insured is subject to the specific condition that:

3.    *prior to*:
   a.    *the inception date of the first policy issued by the **Company*** or any subsidiary or affiliate of the ***Company***, if continuously renewed; or,
   b.    the date the **Insured** first became a member or employee of the **Named Insured** or a **predecessor firm**,

whichever is later, *no **Insured** had a basis to believe that any such act or omission, or **related act or omission**, might reasonably be expected to be the basis of a **claim**;* . . .

*Id.* § I.A.3 (italic emphasis added).

"The Policy defines "Insured" in relevant part to mean:

the **Named Insured, predecessor firm**, and the persons or entities described below:

1.    any lawyer . . . who is or becomes a partner, officer, director, stockholder-employee, associate, manager or salaried employee of the **Named Insured** during the **policy period** shown in the Declarations."

*Id.*, § III.G.1.

The Policy defines "Named Insured" to mean "the persons and entities designated in the

Declarations."  *Id.*, § III.I.  The Firm is the "Named Insured" under the Policy, and

Mr. Goldschmidt is an "Insured," within the meaning of the Policy.  By letters dated March 14,

2006 and April 27, 2006, Continental advised the Firm that there was no coverage for this matter

under the Policy.  Pleadings, ¶ 42.

## III.
## ARGUMENT

**A.**    **Standard for Judgment on the Pleadings and for Summary Judgment**

A party may move for judgment on the pleadings, pursuant to Fed. R. Civ. P. 12(c), at

any time "after the pleadings are closed but within such time as not to delay the trial." *Maniaci*

*v. Georgetown Univ.*, 510 F. Supp. 2d 50, 58 (D.D.C. 2007); Fed. R. Civ. P. 12(c).  Judgment on

the pleadings is appropriate when there are no material facts in dispute, and judgment may be

rendered as a matter of law considering the substance of the pleadings and any judicially noticed

facts. *Horsley v. Rivera*, 292 F.3d 695, 700 (11th Cir. 2002); *U.S. ex rel. Miller v. Bill Harbert*

*Int'l Constr., Inc.*, 505 F. Supp. 2d 20, 25 (D.D.C. 2007).  The analysis for Rule 12(c) motions is

virtually identical to that which governs motions to dismiss pursuant to Rule 12(b)(6).  *See*

*Miller*, 505 F. Supp. 2d at 25.

Summary judgment is appropriate where "there is no genuine issue as to any material fact

and … the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); s*ee also*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Here, the material facts are not in dispute

and the issue presented is strictly a legal one:  does § I.A.3 of the Policy bar coverage for the

Malpractice Lawsuit?  As shown below, the answer to this question is an unqualified yes,

because Mr. Goldschmidt knew that he failed to file a timely answer and to obtain relief for

RESD from the default judgment entered against it, and therefore had knowledge of acts or

omissions which might reasonably be expected to be the basis of a claim against him or the Firm.

Accordingly, this claim plainly is barred by § I.A.3 of the Policy, and Continental therefore is

entitled to a declaration that it has no obligation under the Policy with respect to the Malpractice

Lawsuit as a matter of law.

Under established rules of construction, the interpretation of an insurance policy such as the one issued to the Firm is a matter of law for the Court. *See Rubins Contractors, Inc. v. Lumbermens Mut. Ins. Co.*, 821 F.2d 671, 673 (D.C. Cir. 1987). Where "policies are clear and unambiguous, they will be enforced by the courts as written, so long as they do not violate a statute or public policy."[2] *Chase v. State Farm Fire & Cas. Co.*, 780 A.2d 1123, 1132 (D.C. 2001) (citation and quotations omitted). *Accord Hartford Accident & Indem. Co. v. Pro-Football, Inc.*, 127 F.3d 1111, 1114 (D.C. Cir. 1997). Here, these principles mandate a ruling that, as a matter of law, the Policy provides no coverage for the Malpractice Lawsuit for the reasons set forth at greater length below.

**B.    Policy Section I.A.3 Unambiguously Bars Coverage for the Malpractice Lawsuit**

The Policy is a claims made policy, which provides coverage for all claims "first made against the Insured and reported in writing to the Company during the policy period."[3] *See* Policy, § I.A. It is well settled that an insurer issuing a claims made policy acts reasonably in excluding coverage for alleged wrongful acts that an insured knew or should have known might be the basis of a claim before the policy, or here, the first Policy issued by the insurer, was issued. As one court has explained:

> The reasonableness of excluding claims based on prior conduct that the insured could reasonably have foreseen might serve as the basis for a future claim is

---

[2] Policy language excluding coverage for prior knowledge of circumstances which may result in a claim has been widely applied by courts as a matter of law and held not to be against public policy. *See, e.g., Truck Ins. Exch. v. Ashland Oil, Inc.*, 951 F.2d 787, 790 (7th Cir. 1992); *Ann Arbor Pub. Sch. v. Diamond State Ins. Co.*, 236 F. App'x 163, 167 n.1 (6th Cir. 2007).

[3] "[A] predicate to claims-made coverage is that the insured neither knew of a claim nor could have reasonably foreseen that a known circumstance, act or omission might reasonably be expected to be the basis of a claim or suit." 5 Ronald E. Mallen and Jeffrey M. Smith, Legal Malpractice § 34:14, at 81 (2007 ed.) ("Mallen").

apparent.  The insurance company is entitled to protect itself against the professional who, recognizing his past error or omission, rushes to purchase a "claims-made" policy before the error is discovered and a claim is asserted against him.  This insurance company concern has been termed the "moral hazard."

*Zuckerman v. Nat'l Union Fire Ins. Co.,* 495 A.2d 395, 403-04 n.3 (N.J. 1985) (citations omitted).  *Accord, Westport Ins. Corp. v. Albert*, 208 F. App'x 222 (4th Cir. 2006).  *Culver v. Cont'l Ins. Co.,* 11 F. App'x 42 (4th Cir. 1999) (holding that claims made policy did not provide coverage for attorney's malpractice where claim was reasonably foreseeable at the time of application ) (Maryland law).  Thus, the use of the language at issue in claims made policies is common and "uncontroversially proper." *Truck Ins. Exch.,* 951 F.2d at 791.  Otherwise, an insurer would be forced to provide coverage for an indeterminate number of pre-existing claims, for which it would have no reasonable basis for estimating the risk.  *Cf. Stonehenge Eng'g Corp. v. Employers Ins. of Wausau*, 201 F.3d 296, 302 (4th Cir. 2000) (approving discussion of "known loss" doctrine's exclusion of coverage for losses of which the insured had actual knowledge before the policy's effective date or knew were substantially certain to occur).

Precisely because of this "moral hazard," the Policy's Insuring Agreement provides coverage only to the extent that, prior to the inception date of the first policy issued to the insured, *no insured had a basis to believe that any such act or omission might reasonably be expected to be the basis of a claim*.  Ex. A., Policy § I.A.3 (emphasis added).

There appears to be no District of Columbia case law interpreting this specific policy language.[4]  However, in 2006, this Court evaluated a similar prior knowledge case under

---

[4] We note that the  Policy's exclusionary language differs significantly from the insurance application language that the D.C. Court of Appeals analyzed in *Skinner v. Aetna Life & Casualty*, 804 F.2d 148 (D.C. Cir. 1986).  In *Skinner*, the insurer sought rescission of the Policy pursuant to D.C. Code Ann. §35-414 (1981) on the basis of the insured's response to an
(continued on the next page)

Virginia law and applied an objective, reasonable person standard for evaluating whether the

insured was "aware of any incident that could reasonably result in a claim being made against"

it.  *See Minn. Lawyers Mut. Ins. Co. v. Hahn*, Civil Action No. 04-0640, 2004 U.S. Dist. LEXIS

24689, at *2, *9 (D.D.C. Dec. 9, 2004).  In the *Hahn* decision, this Court adopted the

overwhelmingly majority objective position, which has also been adopted by both Virginia and

Maryland[5], which asks whether a reasonable person, in possession of the facts known to the

_____

(continued from the previous page)

application question asking:  "During the past 5 years, have you been treated for any sickness,
disease or injury, or had any departures from good health not stated elsewhere on the
application?"  Application responses were held to be qualified by a concluding sentence:  "The
foregoing statements and answers are true and complete to the best of my knowledge and belief."
*Id.* at 149-50.  The Court of Appeals held that the inclusion of the "to best of my knowledge and
belief" language shifted the inquiry to the applicant's "actual knowledge and belief," rather than
creating a purely objective standard.  Here, the Policy itself creates a purely objective
"reasonable person" standard, with no qualifying "best of my knowledge and belief" language.
Furthermore, in *Skinner*, the Court held that the insurer was entitled to summary judgment
because, given the facts admittedly known to the insured, the answer on the application was false
as a matter of law.  So too in this case: as a matter of law, an attorney is aware of acts or
omissions that "might reasonably be expected to be the basis of a claim" where the attorney
knows that a default was entered against his client because the attorney failed to file a timely
answer, knows that a large judgment was entered against the client based on the default, knows
that the trial court denied a motion to vacate the default, knows that the trial court denied a
motion for reconsideration of its refusal to vacate the default, and knows that the only hope of
vacating the default judgment is to succeed as appellant in a pending appeal.  *Id.*

        Likewise, there was no "reasonableness" language in the question that the insured answered
in *National Union Fire Ins. Co. v. Mason, Perrin & Kanovksy*, 765 F. Supp. 15 (D.D.C. 1991).
There, National Union sought to rescind the applicable policy on the basis of fraud, after the
insureds responded "no" to an application question that asked:  "Is any applicant aware of any
circumstances which may result in any claim being made against the applicant, their (his)
predecessors in business, or any of the present or past partners?"  *Id.* at 16.  The court ruled that
the question required an inquiry into defendants' "actual knowledge" at the time of the
application.  Based on a determination that there was an issue of fact regarding what the
attorneys knew at the relevant time, the court denied the insurer's motion for summary judgment.
In contrast, in this case, Mr. Goldschmidt admittedly had actual knowledge of the facts (entry of
default, denial of the motion to vacate the default, etc.) that establish as a matter of law that he
was aware of circumstances that might reasonably be expected to be the basis of a claim.

        [5] When there is no applicable District of Columbia law, courts look to the law of Maryland.
*See, e.g., West v. U.S.*, 866 A.2d 74, 79 n.1 (D.C. 2005) ("We may, of course, look to Maryland
law because the District of Columbia derives its common law from Maryland as of 1801");
*Sharp v. Wood*, No. 01-CA-2184, 2004 WL 1835012, at *3 (D.C. Super. Ct. 2004) (looking to
(continued on the next page)

insured, would have had a reasonable basis to know that a claim might be made. *See, e.g., Cont'l Cas. Co. v. Graham & Schewe*, 339 F. Supp. 2d 723, 727 (E.D. Va. 2004) (applying an objective standard to evaluate an insured's prior knowledge in a professional liability insurance case); *Culver,* 11 F. App'x 42, 46, 1999 WL 503527, at *3 (4th Cir. 1999) (invoking "an objective standard of foreseeability" where the policy application asked whether the applicant knew "of any circumstance, act, error or omission that could result in a claim or suit") (Maryland law); *Int'l Surplus Lines Ins. Co. v. Univ. of Wyo. Research Corp.,* 850 F. Supp. 1509, 1521 (D. Wyo. 1994) (applying objective standard and explaining that the prior knowledge exclusion "does not require that the person know that a claim has already been threatened, but only whether such a claim could reasonably be anticipated in the future – as a matter of probabilities – and in keeping with the facts known to exist at that time"(footnote omitted)), *aff'd sub nom., Int'l Surplus Lines Ins. Co. v. Wyo. Coal Refining Sys. Corp.,* 52 F.3d 901 (10th Cir. 1995); *Prof'l Managers, Inc. v. Fawer, Brian, Hardy & Zatzkis*, 799 F.2d 218, 221 (5th Cir. 1986) (affirming summary judgment for insurer based on insured's failure to disclose "ticking bomb," of which the insured was aware before policy inception); Mallen, § 34:14, at 85 (Because the "reasonably be expected" standard for disclosure is objective, "[i]t is not based on the insured's subjective state of mind").  Accordingly, Mr. Goldschmidt's knowledge of acts or omissions as of the inception of the First Policy must be evaluated on an objective standard, and his subjective impressions regarding the likelihood of future claims are irrelevant.

---

(continued from the previous page)

Maryland law in the absence of D.C. law regarding an excess insurance issue).  The Fourth Circuit has held that Maryland would adopt the objective standard. *See, e.g., Culver*, 11 F. App'x at 46.

The Court should analyze (1) what the lawyer knew and (2) how a reasonable lawyer would construe these facts.[6]  Mallen, § 34:14, at 86; *Westport Ins. Corp. v. Lilley*, 292 F. Supp. 2d 165 (D. Me. 2003).  As applied here, at the time of the inception of the First Policy, Mr. Goldschmidt was aware that he had failed to file the answer, resulting in a default being entered against its client.  *Pleadings*, ¶¶ 10, 12.  He knew that at the subsequent trial on damages only, a damages verdict in excess of $800,000 had been entered against the Firm's client.  *Pleadings*, ¶ 18.  He knew that despite its multiple efforts to seek vacation of the default, through a motion to vacate, a motion to reconsider, and the appeal (which was pending), the default judgment was still in place against his client.  *Pleadings*, ¶¶ 14, 15, 20.  Finally, Mr. Goldschmidt knew that, in his effort to vacate the default judgment, he would have to admit in publicly-filed court papers that his Firm had erred, including by having failed to "calendar" the answer due date and by "for[getting]" about the answer.  Court of Appeals Opinion, 852 A.2d at 957 n.7.  With knowledge of both his prior conduct and the facts and circumstances surrounding the Firm's critical omissions, any reasonable attorney would recognize that there was reason to believe that such omissions "might reasonably be expected to be the basis of [a] claim."

---

[6] Thus, Section I.A.3 has a limited subjective element in that the exclusion's purely objective standard is applied to the facts actually known to the insured.  Thus, for example, if an attorney fails to file a complaint before the expiration of the applicable statute of limitations, but is not aware before the applicable policy inception date that he missed the statute, the exclusion is not triggered.  However, if the attorney knows before the inception date that he missed the statute, the exclusion bars coverage because a reasonable attorney would recognize that missing a statute of limitations might be expected to be the basis of a claim; it is completely irrelevant whether the particular insured subjectively believed that a claim might be made.  In this case, it is undisputed that Mr. Goldschmidt knew the trial court had entered a default, that a large judgment had been entered, and that the trial court had refused two requests to vacate the default.  Applying the objective standard of I.A.3 to those facts, it is beyond reasonable dispute that Mr. Goldschmidt was aware of acts or omissions that might reasonably be expected to be the basis of a claim.

In fact, it is difficult to imagine a situation which could have been a stronger indication to Mr. Goldschmidt and the Firm that a lawsuit might be filed against them. Mallen states that: "Knowledge of a missed time limitation . . . is a circumstance that often leads to a claim." Mallen, § 34:14, at 87. An attorney's knowledge that he has missed a deadline, thereby precluding a client from establishing its case on the merits, repeatedly has been held to bar coverage based on substantially similar policy language. *Coregis Ins. Co. v. Wheeler*, 24 F. Supp. 2d 475 (E.D. Pa. 1998) (knowledge of failure to timely assert a valid claim was sufficient knowledge of circumstances that could be the basis of a legal malpractice claim); *Coregis Ins. Co. v. Baratta & Fenerty, Ltd.*, 264 F.3d 302 (3d Cir. 2001), *aff'g* 57 F. Supp. 2d 179 (E.D. Pa. 1999) (an attorney's failure to have an appellate court reinstate an action was sufficient knowledge of circumstances that could be the basis of a legal malpractice claim); *Home Indemn. Co. v. Toombs*, 910 F. Supp. 1569 (N.D. Ga. 1995) (no coverage under Policy when insured had knowledge prior to inception that he refiled an action after the statute of limitations, having voluntarily dismissed it previously.)

Indeed, in nearly identical circumstances involving default judgments, courts have ruled that insurers have no obligation to defend or indemnify attorney insureds. In *Wittner, Poger, Rosenblum & Spewak v. Bar Plan Mutual Insurance Co.*, 969 S.W.2d 749 (Mo. 1998), the court declared coverage was not available based on substantially similar policy language when an attorney failed to file an answer to a divorce decree, resulting in a default final decree being entered in favor of the other spouse. In *Fogelson v. Home Insurance Co.*, 129 A.D.2d 508 (N.Y. App. Div. 1987), the applicable policy offered coverage to the extent that, prior to the policy's effective date, no insured had reason to believe that the insured had breached a professional duty. *Id.* at 509-10. The insureds admitted that they had failed to file a timely answer on behalf of

their clients in a mortgage foreclosure action several years before the inception of the applicable

policy, and that their subsequent efforts in the intervening years to vacate the default judgment

had been unsuccessful.  *Id.* at 508-09.  The court held that "plaintiffs clearly had a basis to

believe [four years before the inception of the applicable policy that] they had breached a

professional duty which might reasonably be foreseen to be the basis of a claim or suit."[7]  *Id.* at

512.

      To establish prior knowledge, there is no requirement that the client complain ahead of

time or indicate that it will file a claim against the insured.  *Toombs*, 910 F. Supp. at 1574; *Mt.*

*Airy Ins. Co. v. Thomas*, 954 F. Supp. 1073, 1080 (W.D. Pa. 1997) ("Any dispute over whether

the defendant believed [that the client would make the claim], on the basis of his relationship

with his client or [what] his impression [was] of that client's reaction to the situation, . . . is not

relevant to our analysis"), *aff'd*, 149 F.3d 1165 (3d Cir. 1998).  It is also irrelevant whether Mr.

Goldschmidt believed that any malpractice claim against the Firm arising out of this matter

would have merit.  *See, e.g., id; Terrell, Thorpe & Findlay, Inc., P.S.  v. Cont'l Ins. Co.*, 825

P.2d 724, 728 (Wash. Ct. App. 1992).  The only material question here is:  Was the insured

---

    [7] To support its reasoning, and to respond to the argument that denying coverage on the
basis of the "prior knowledge" exclusion may render consecutive claims-made coverage illusory,
the *Fogelson* court quoted the following language:

> We are of the firm opinion that the freedom to offer malpractice insurance
> contracts similar to the one before us serves the public interest. . . .  Moreover, the
> requirement of retroactive coverage for a "claims made" policy to be valid, would
> likely be an invitation to fraud. It would enable the insured to obtain coverage for
> past negligent conduct known to him but unknown to the insurer.  Indeed, it
> would be literally impossible in many cases for the insurer to protect itself when
> extending insurance to applicants who wished to purchase coverage while
> concealing past acts which the applicant knew, or had reason to believe, might
> lead to a claim.

129 A.D.2d at 512 (quoting, *Brander v. Nabors*, 443 F. Supp. 764, 773 (N.D. Miss.),
*aff'd*, 579 F.2d 888 (5th Cir. 1978)).

aware of any act or omission which gave him reason to believe that such act or omission might

reasonably be expected to be the basis of a claim?  And the answer is a resounding yes, as a

matter of law.  Accordingly, coverage for this matter is barred under the Policy, pursuant to §

I.A.3.

## IV.
## CONCLUSION

For the foregoing reasons, Continental is entitled to a declaratory judgment that

Continental has no duty to defend or indemnify the Insureds with regard to the claims asserted

against them in the Malpractice Lawsuit

                              Respectfully submitted,

                              ROSS, DIXON & BELL, LLP


Dated: January 30, 2008          By: /s/ Kelly V. Overman_____
                                    Richard A. Simpson
                                    (D.C. Bar No. 411893)
                                    Kelly V. Overman
                                    (D.C. Bar No. 482077)
                                    2001 K Street, N.W.
                                    Washington, D.C.  20006
                                    Telephone:  (202) 662-2000
                                    Facsimile:  (202) 662-2190

                                    *Counsel for Plaintiff*
                                    *Continental Casualty Company*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Continental Casualty Company's Motion for Judgment on the Pleadings, or in the Alternative, Motion for Summary Judgment, as well as the accompanying Memorandum of Points and Authorities, Statement of Material Facts as to Which There is No Genuine Dispute, Declaration of Kelly V. Overman, and Proposed Order, were filed electronically, as well as e-mailed and mailed, first-class postage prepaid, this 30th day of January, 2008 to:

> Michael E. Tucci, Esq.
> Darrell W. Clark, Esq.
> Jaime Dibble, Esq.
> Stinson Morrison Hecker, LLP
> 1150 18th Street, N.W., Suite 800
> Washington, D.C.  20036

> /s/ Kelly V. Overman
> Kelly V. Overman

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| Bryan S. Ross, Chapter 7 Trustee )<br>　　　　　　　　　　　　　　　　Plaintiff, )<br>v.　　　　　　　　　　　　　　　　　　　　 )<br>Continental Casualty Company 　　　 )<br>　　　　　　　　　　　　　　　　Defendant. ) | Case:  1:07-CV-01450<br><br>Assigned to:  Roberts, Richard W.<br><br>Assign Date:  8/10/2007<br><br>Description:  Contract |

### DEFENDANT CONTINENTAL CASUALTY COMPANY'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE DISPUTE

Pursuant to Local Rules 7(h) and 56.1, Defendant Continental Casualty Company ("Continental"), in support of its Motion for Judgment on the Pleadings, or in the Alternative, Motion for Summary Judgment, hereby submits this Statement of Material Facts as to Which There is no Genuine Dispute.

**I.      STATEMENT OF UNDISPUTED MATERIAL FACTS**

      **A.      The Underlying Action**

1.      Restaurant Equipment & Supply Depot, Inc. ("RESD") retained Stanley H. Goldschmidt to defend it against an employment lawsuit filed in February 2000 in the Superior Court for the District of Columbia (the "Underlying Litigation").  Counterclaim of Continental Casualty Company ("Counterclaim") at ¶ 8; Reply of Bryan S. Ross ("Reply") at ¶ 8 (collectively, the Counterclaim and Reply are hereafter referred to as the "Pleadings").

2.      On behalf of RESD, on May 5, 2000, Mr. Goldschmidt filed a motion to dismiss the Underlying Litigation, which the trial court denied on September 11, 2000.  Pleadings, ¶ 9.

3.      The denial of RESD's motion triggered its obligation to file a timely answer, but the Firm failed to file an answer on behalf of RESD.  Pleadings, ¶ 10.

4.      When no answer was filed, the plaintiffs in the Underlying Litigation sought entry of a default judgment on December 11, 2000.  Pleadings, ¶ 12.

5.      On January 2, 2001, the trial court entered an Order of Default as to liability against RESD and set the case for a damages hearing on February 16, 2001.  Pleadings, ¶ 13.

6.      On January 17, 2001, Mr. Goldschmidt filed a motion to vacate the default judgment, which the Court denied on February 14, 2001.  Pleadings, ¶ 14.

7.      When the Motion to Vacate was unsuccessful, on March 7, 2001, Mr. Goldschmidt filed a Motion for Reconsideration of the Entry of Judgment by Default, which the Court denied on April 12, 2001.  Pleadings, ¶ 15.

8.      Beginning on April 23, 2001, the trial court held a jury trial on damages. Pleadings, ¶ 17.  On May 1, 2001, the court entered judgment against RESD on the jury verdict in excess of $800,000.  Pleadings, ¶ 18.  Thereafter, the plaintiffs in the Underlying Litigation filed a motion for attorneys' fees and costs, which was granted.  Pleadings, ¶ 19.

9.      Mr. Goldschmidt filed a notice of appeal on behalf of RESD on May 16, 2001, submitted briefs, and attended oral argument on April 22, 2004.  Pleadings, ¶ 20.

10.     On July 1, 2004, the District of Columbia Court of Appeals affirmed the trial court's ruling.  Pleadings, ¶ 22; *Rest. Equip. & Supply Depot, Inc. v. Gutierrez*, 852 A.2d 951 (D.C. 2004) (the "Court of Appeals Opinion").  A true and correct copy of the Court of Appeals Opinion is attached to the Declaration of Kelly V. Overman in Support of Continental Casualty Company's Motion for Judgment on the Pleadings, or in the Alternative, Motion for Summary Judgment (the "Overman Declaration") as Exhibit C.

11.    In the RESD appellate brief, Mr. Goldschmidt asserted a number of excuses for the Firm's failure to file the answer timely.  The Court of Appeals decision in the Underlying Litigation cites several of these excuses:

> (1) they were short-staffed because one of their associates left the firm during the litigation; (2) they inadvertently failed to "calendar" the due date for the answer; (3) appellee's failed to notify them that their answer was delinquent between September 29, 2000 and December 11, 2000; (4) they *forgot* about the answer during the long pendency of their motion to dismiss; and (5) they were unable to contact their clients during the holiday season and were unable to finish the answer.

Court of Appeals Opinion, at 957, n.7 (emphasis added).

12.    On July 15, 2004, Mr. Goldschmidt filed a Petition for En Banc Review with the District of Columbia Court of Appeals, which the appeals court denied on October 28, 2004. Pleadings, ¶ 23.  Accordingly, the default was never lifted.

**B.    After RESD Filed For Bankruptcy, a Trustee was Appointed, who Filed the Malpractice Suit**

13.    On September 2, 2005, RESD filed a voluntary petition for bankruptcy under Chapter 7 of the Bankruptcy Code.  Pleadings, ¶ 26.  Bryan S. Ross was appointed as the trustee of the RESD bankruptcy estate (the "Trustee").  Pleadings, ¶ 27.

14.    By letter dated January 6, 2006, the Trustee advised Mr. Goldschmidt that he believed that the bankruptcy estate possessed a legal malpractice claim against Mr. Goldschmidt and the Firm..  Pleadings, ¶ 28.  On February 17, 2006, the Trustee filed a malpractice lawsuit styled *Ross, Trustee in Bankruptcy for Restaurant Equipment & Supply Depot, Inc. v. The Law Offices of Stanley H. Goldschmidt, P.C.* (the "Malpractice Lawsuit") as an adversary pleading in the bankruptcy case.  Pleadings, ¶ 29.  A true and correct copy of the Complaint in the Malpractice Lawsuit is attached to the Overman Declaration as Exhibit B.

15.     Judgment was entered against Mr. Goldschmidt in the Malpractice Lawsuit in the amount of $909,277.98 plus interest.  Pleadings, ¶ 31.

16.     Mr. Goldschmidt, the Firm, and the Trustee entered into a settlement of the Malpractice Lawsuit, pursuant to which the Mr. Goldschmidt paid only $60,000 and the Trustee obtained an assignment of the Firm's rights under the Policy.  Pleadings, ¶ 32.

17.     Continental did not provide its written consent to the assignment.  Pleadings, ¶ 33.

### C.     The Policy

18.     Continental issued the claims made and reported Lawyers Professional Liability Policy No. LAW 267870255 to the Firm for the policy period May 1, 2005 to May 1, 2006 (the "Policy").  *Id.* at ¶ 34.  However, the Policy was cancelled as of July 1, 2005.  *Id.*  A true and correct copy of the Policy is attached to the Overman Declaration as Exhibit A.

19.     The Firm purchased an extended reporting period upon cancellation of the policy, and the Malpractice Lawsuit is a claim reported under the extended reporting period.  *Id.* at ¶ 34-35.

20.     The Policy is a renewal of the first policy issued by Continental to the Firm.  *Id.* at ¶ 36.  The first policy issued by Continental (or any subsidiary or affiliate of Continental) to the Firm was issued for the May 1, 2003 to May 1, 2004 policy period (the "First Policy").  *Id.*

21.     Subject to all of the Policy's terms and conditions, the Policy's basic insuring agreement provides coverage for:

> all sums in excess of the deductible that the **Insured** shall become legally obligated to pay as **damages** and **claim expenses** because of a **claim** that is both first made against the **Insured** and reported in writing to the **Company** during the **policy period** by reason of an act or omission in the performance of **legal services** by the **Insured** or by any person for whom the **Insured** is legally liable . . .

Exhibit A, Policy, § I.A.

22.    Moreover, the Policy provides that Continental's duty to pay sums on behalf of an

Insured is subject to the specific condition that:

> 3.    *prior to:*
>
> a.    *the inception date of the first policy issued by the* **Company** *or any subsidiary or affiliate of the* **Company**, *if continuously renewed; or,*
>
> b.    the date the **Insured** first became a member or employee of the **Named Insured** or a **predecessor firm**,
>
> whichever is later, *no* **Insured** *had a basis to believe that any such act or omission, or* **related act or omission**, *might reasonably be expected to be the basis of a* **claim**; . . .

*Id.* § I.A.3 (italic emphasis added).

23.    "The Policy defines "Insured" in relevant part to mean:

> the **Named Insured, predecessor firm**, and the persons or entities described below:
>
> 1.    any lawyer . . . who is or becomes a partner, officer, director, stockholder-employee, associate, manager or salaried employee of the **Named Insured** during the **policy period** shown in the Declarations."

*Id.*, § III.G.1.  The Policy defines "Named Insured" to mean "the persons and entities designated

in the Declarations."  *Id.*, § III.I.  The Firm is the "Named Insured" under the Policy, and

Mr. Goldschmidt is an "Insured," within the meaning of the Policy.

24.    By letters dated March 14, 2006 and April 27, 2006, Continental advised the Firm

that there was no coverage for this matter under the Policy.  Pleadings, ¶ 42.

Respectfully submitted,

ROSS, DIXON & BELL, LLP


Dated: January 30, 2008                    By: /s/ Kelly V. Overman
                                               Richard A. Simpson
                                               (D.C. Bar No. 411893)
                                               Kelly V. Overman
                                               (D.C. Bar No. 482077)
                                               2001 K Street, N.W.
                                               Washington, D.C.  20006
                                               Telephone:  (202) 662-2000
                                               Facsimile:  (202) 662-2190

                                               *Counsel for Plaintiff*
                                               *Continental Casualty Company*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| Bryan S. Ross, Chapter 7 Trustee ) | Case:  1:07-CV-01450 |
| Plaintiff, ) | Assigned to:  Roberts, Richard W. |
| v.  ) | Assign Date:  8/10/2007 |
| Continental Casualty Company  ) | Description:  Contract |
| Defendant. ) |  |

**DECLARATION OF KELLY V. OVERMAN IN SUPPORT OF**
**CONTINENTAL CASUALTY COMPANY'S MOTION FOR JUDGMENT ON THE**
**PLEADINGS, OR IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT**

Kelly V. Overman, declares and states, under penalty of perjury pursuant to 28 U.S.C. §

1746, as follows:

1.      I am an attorney with Ross, Dixon & Bell, LLP, which represents Defendant

Continental Casualty Company ("Continental") in this action.

2.      I submit this declaration in support of Continental's Motion for Judgment on the

Pleadings, or in the Alternative, Motion for Summary Judgment.

3.      Attached to this declaration as Exhibit A is a true and correct copy of Lawyers

Professional Liability Policy No. LAW 267870255, issued by Continental to the Law Offices of

Stanley H. Goldschmidt, P.C. for the policy period May 1, 2005 to May 1, 2006, which was

cancelled as of July 1, 2005.

4.      Attached to this declaration as Exhibit B is a true and correct copy of the

Complaint filed in the lawsuit styled *Ross, Trustee in Bankruptcy for Restaurant Equipment &*

*Supply Depot, Inc. v. The Law Offices of Stanley H. Goldschmidt, P.C.*, Case No. 05-01316, filed

in the United States Bankruptcy Court for the District of Columbia.

5.      Attached to this declaration as Exhibit C is a true and correct copy of July 1, 2004

opinion of the District of Columbia Court of Appeals in the lawsuit styled *Rest. Equip. & Supply*

*Depot, Inc. v. Gutierrez*, 852 A.2d 951 (D.C. 2004).

                                        Respectfully submitted,

                                        ROSS, DIXON & BELL, LLP


Dated: January 29, 2008                 By: /s/ Kelly V. Overman                        
                                            Richard A. Simpson
                                            (D.C. Bar No. 411893)
                                            Kelly V. Overman
                                            (D.C. Bar No. 482077)
                                            2001 K Street, N.W.
                                            Washington, D.C.  20006
                                            Telephone:  (202) 662-2000
                                            Facsimile:  (202) 662-2190

                                            *Counsel for Plaintiff*
                                            *Continental Casualty Company*

# EXHIBIT A



# LAWYERS PROFESSIONAL LIABILITY POLICY DECLARATIONS

| Agency: | Branch: | Policy Number: |
|---|---|---|
| 708359 | 912 | 267870255 |

Insurance is provided by Continental Casualty Company, CNA Plaza, Chicago, IL 60685. A Stock Insurance Company.

**1A. NAMED INSURED AND MAILING ADDRESS:**
Law Offices of Stanley H. Goldschmidt, P.C.
1025 Connecticut Avenue, NW
Suite 220
Washington, DC 20036

**NOTICE TO POLICYHOLDERS:**
This is a Claims Made and Reported policy. It applies only to those claims that are both first made against the insured and reported in writing to the Company during the policy period. Please review the policy carefully and discuss this coverage with your insurance agent or broker.

**1B. PREDECESSOR FIRM(S):** See Declarations Addendum

**2. POLICY PERIOD:**
Inception: 05/01/2005
at 12:01 A.M. Standard Time at the address shown above

Expiration: 05/01/2006

**3. LIMITS OF LIABILITY:**
*Inclusive of Claims Expenses*

Each Claim: $2,000,000
Aggregate: $2,000,000

Death or Disability and Non-Practicing
Extended Reporting Period Limit of Liability:

Each Claim: $1,000,000
Aggregate: $2,000,000

**4. DEDUCTIBLES:**
*Inclusive of Claims Expenses*

Aggregate: $10,000
per claim

**5. POLICY PREMIUM:**

Total Policy Premium:

$7,435.00

*Includes CNA Risk Management Seminar Credit of*

$ 0.00

**6. FORMS AND ENDORSEMENTS ATTACHED AT INCEPTION:** *per claim ded    5/1/05 frm retro*
G-118011-A (Ed. 07/2001), G-118012-A (Ed. 03/1999), G-118016-A (Ed. 09/1996), G-118029-A (Ed. 09/1996), G-118039-A08 (Ed. 06/2001), G-144216-A (Ed. 11/2002), G-144872-ALW (Ed. 01/2003), G-145125-A (Ed. 08/2003), G-145184-A (Ed. 06/2003)    *amend of term*

**7. WHO TO CONTACT:**



ROSSMANN-HURT-HOFFMAN, INC.

9011 CHEVROLET DRIVE
ELLICOTT CITY, MD 21042

SINCE 1871

FOR INFORMATION CALL:
(410) 465-4300
TOLL FREE 1-800-345-4133
TELEFAX (410) 465-5151

| Countersignature | Date | Authorized Representative | Date |
|---|---|---|---|
| | | *[signature]* | 5-3-05 |



**LAWYERS PROFESSIONAL LIABILITY POLICY
DECLARATIONS ADDENDUM**

Item 1.B.   PREDECESSOR FIRM(S):

NONE



## CONTINENTAL CASUALTY COMPANY
### CNA PLAZA
### CHICAGO, ILLINOIS 60685

LAWYERS PROFESSIONAL LIABILITY POLICY

ATTORNEY SCHEDULE

**Policy Number:**     267870255

**Name of Each Lawyer**
Stanley H. Goldschmidt
Tamir D. Damari

**Social Security Number**

**REDACTED**

ATTYSCH

Page 1 of 1



**CONTINENTAL CASUALTY COMPANY**
**CNA PLAZA**
**CHICAGO, ILLINOIS 60685**

---

**LAWYERS PROFESSIONAL LIABILITY POLICY**

**EACH CLAIM DEDUCTIBLE ENDORSEMENT**

In consideration of a premium credit, it is understood and agreed that Item 4. of the Declarations is deleted and replaced in its entirety by the following:

    4.    DEDUCTIBLE:    Each claim:  $10,000
                                         *inclusive of claims expenses.*

It is further understood and agreed that Section II, LIMITS OF LIABILITY AND DEDUCTIBLE, paragraph (C), entitled Deductible, is deleted in its entirety, and the following is substituted in place thereof:

    (C)    Deductible - Each Claim

        The deductible amount stated in the Declarations for "each claim" applies to each and every claim made against an Insured. It shall be paid by the Named Insured and applies to the payment of damages and claims expenses for claims both first made against the Insured and reported to the Company in writing during the policy period. In the event the Named Insured fails to pay, the deductible shall be paid jointly and severally by all Insureds. The limits of liability set forth in the Declarations are in addition to and in excess of the deductible.

All other terms and conditions of the Policy remain unchanged.

ENDORSEMENT NUMBER: 1
POLICY NUMBER: 267870255
ISSUED TO: Law Offices of Stanley H. Goldschmidt, P.C.
EFFECTIVE DATE OF ENDORSEMENT: 05/01/2005

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy and expires concurrently with said Policy unless another effective date is shown above.

By Authorized Representative
(No signature is required if this endorsement is issued with the Policy or if it is effective on the Policy Effective Date)

G-118016-A (Ed. 09/96)

                                      Page 1 of 1

 INSURANCE IN TOUCH WITH BUSINESS

## CONTINENTAL CASUALTY COMPANY
### CNA PLAZA
### CHICAGO, ILLINOIS 60685

LAWYERS PROFESSIONAL LIABILITY POLICY

RETROACTIVE EXCLUSION CLAUSE ENDORSEMENT

It is understood and agreed that Section I., Insuring Agreement, Paragraph A., is amended to include a new subparagraph (5) as follows:

A(5).  the act or omission occurred on or after 05/01/1995.

All other provisions of this Policy remain unchanged.

POLICY NO:267870255

THIS ENDORSEMENT FORMS A PART OF THE ABOVE REFERENCED POLICY, AND TAKES EFFECT ON THE EFFECTIVE DATE AND HOUR OF SAID POLICY UNLESS ANOTHER EFFECTIVE DATE IS SHOWN BELOW, AND EXPIRES CONCURRENTLY WITH SAID POLICY.

ISSUED  TO:  LAW  OFFICES  OF  STANLEY  H.  EFFECTIVE DATE
GOLDSCHMIDT, P.C.

OF THIS ENDORSEMENT  05/01/2005

Complete only when this Endorsement is not prepared with the Policy or is not to be effective with the Policy
Countersigned by

AUTHORIZED REPRESENTATIVE

G-118029-A (Ed. 09/96)

**CNA** INSURANCE IN TOUCH WITH BUSINESS

## CONTINENTAL CASUALTY COMPANY
## CNA PLAZA
## CHICAGO, ILLINOIS 60685

### LAWYERS PROFESSIONAL LIABILITY POLICY

### AMENDMENT OF TERMINATION PROVISIONS
### DISTRICT OF COLUMBIA

It is understood and agreed that Condition L. Cancellation/Nonrenewal is deleted and replaced in its entirety by the following:

L.  Cancellation/Nonrenewal

  1.  Cancellation

  a.  This Policy may be canceled by the **Named Insured** by returning it to the **Company**. The **Named Insured** may also cancel this Policy by written notice to the **Company** stating at what future date cancellation is to be effective.

  b.  The **Company** may cancel this Policy by mailing, or by delivery of a written notice of cancellation to the **Named Insured** to the mailing address last known to the **Company** at least 30 days prior to the effective date of cancellation. At least 5 days prior to sending notice to the **Named Insured**, the **Company** will notify the agent or broker, if any, who wrote the Policy at the last mailing address known to the **Company**. The time of surrender or the effective date and hour of cancellation stated in the notice shall become the end of the **policy period**. Delivery (where permitted by law) of such written notice either by the **Named Insured** or by the **Company** shall be equivalent to mailing.

  c.  If this Policy is a new policy and has been in effect for 30 days or less, the **Company** may cancel for any reason.

  d.  If this Policy is in effect for more than 30 days, or if it is a renewal of a policy issued by the **Company**, the **Company** may cancel only for one or more of the following reasons:

  (1)  Nonpayment of premium or failure to pay amounts in excess of the limit of the **Company**'s liability or within the amount of the deductible; or

  (2)  Material misrepresentation or fraud made by the **Named Insured** or with the **Named Insured**'s knowledge in obtaining this Policy or in pursuing a **claim** under this Policy; or

  (3)  There has been a substantial change in the scale of risk covered by this Policy; or

  (4)  The interest of the **Insured** shall have been transferred to a person other than the **Insured** or beneficiary, unless the transfer is permitted under the terms of this Policy.

  e.  If the **Company** cancels this Policy, the earned premium shall be computed pro rata. If the **Named Insured** cancels its Policy, the **Company** shall retain the customary short rate proportion of the premium. Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

  2.  Nonrenewal

 INSURANCE IN TOUCH WITH BUSINESS

a.  If the **Company** elects to nonrenew this Policy, the **Company** will mail, or deliver written notice of nonrenewal to the **Named Insured** at the last mailing address known to the **Company**, at least 30 days prior to the expiration date of this Policy. At least 5 days prior to sending notice to the **Named Insured**, the **Company** will notify the agent or broker, if any, who wrote the Policy at the last mailing address known to the **Company**. Delivery (where permitted by law) of such written notice by the **Company** shall be equivalent to mailing.

b.  The offering of terms and conditions different from the expiring terms and conditions does not constitute a refusal to renew.

All other terms and conditions of the Policy remain unchanged.

---

POLICY NO.267870255

THIS ENDORSEMENT FORMS A PART OF THE ABOVE REFERENCED POLICY, AND TAKES EFFECT ON THE EFFECTIVE DATE AND HOUR OF SAID POLICY UNLESS ANOTHER EFFECTIVE DATE IS SHOWN BELOW, AND EXPIRES CONCURRENTLY WITH SAID POLICY.

ISSUED  TO:  LAW  OFFICES  OF  STANLEY  H.  EFFECTIVE DATE
GOLDSCHMIDT, P.C.

OF THIS ENDORSEMENT 05/01/2005

*Complete only when this Endorsement is not prepared with the Policy or is not to be effective with the Policy*
Countersigned by_____
AUTHORIZED REPRESENTATIVE

G-118039-A08  (Ed. 06/01)

**CNA**

# IMPORTANT INFORMATION

## POLICYHOLDER DISCLOSURE

## NOTICE OF INSURANCE COVERAGE

## FOR ACTS OF TERRORISM

You are hereby notified that under the Terrorism Risk Insurance Act of 2002, effective November 26, 2002, that you are entitled to insurance coverage for losses arising out of acts of terrorism, *as defined in the Act*, subject to all applicable policy provisions.

You should know that any covered losses caused by acts of terrorism will be partially reimbursed by the United States under a formula established by federal law. Under this formula, the United States pays 90% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The premium as of this date that is attributable to coverage for acts of terrorism is $0.

 



**Continental Casualty Company**
**CNA PLAZA**
**CHICAGO, ILLINOIS 60685**

### LAWYERS PROFESSIONAL LIABILITY POLICY

#### COVERAGE OF AND CAP ON LOSSES FOR CERTIFIED ACTS OF TERRORISM

In consideration of the premium charge of $0, it is agreed as follows:

1.  The DEFINITIONS section is amended by the addition of the following new term:

    "**Certified Act of Terrorism**" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002.
    The federal Terrorism Risk Insurance Act of 2002 sets forth the following criteria for a **Certified Act of Terrorism:**

    a.  The act resulted in aggregate losses in excess of $5 million; and

    b.  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

2.  This Policy provides coverage for losses arising from **Certified Acts of Terrorism** subject to all other terms and conditions of this policy.

3.  Under the federal Terrorism Risk Insurance Act of 2002, any losses caused by **Certified Acts of Terrorism** will be partially reimbursed by the United States under a formula established by federal law. Under this formula, the United States pays 90% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage.

4.  With respect to any one or more **Certified Acts of Terrorism**, the Insurer will not pay any amounts for which the Insurer is not responsible under the terms of the federal Terrorism Risk Insurance Act of 2002 (including subsequent acts of Congress pursuant to the Act) due to the application of any clause in such law which results in a cap on the Insurer's liability for payments for terrorism losses.

All other provisions of the Policy remain unchanged.

---

**POLICY NO. 267870255**

THIS ENDORSEMENT FORMS A PART OF THE ABOVE REFERENCED POLICY, AND TAKES EFFECT ON THE EFFECTIVE DATE AND HOUR OF SAID POLICY UNLESS ANOTHER EFFECTIVE DATE IS SHOWN BELOW, AND EXPIRES CONCURRENTLY WITH SAID POLICY.

**ISSUED TO: LAW OFFICES OF STANLEY H. GOLDSCHMIDT, P.C.**

**EFFECTIVE DATE**

**OF THIS ENDORSEMENT 05/01/2005**

---

*Complete only when this Endorsement is not prepared with the Policy or is not to be effective with the Policy*
Countersigned by

AUTHORIZED REPRESENTATIVE

G-144872-ALW (Ed. 01/03)



**POLICYHOLDER NOTICE**

Ethics and proper business conduct has been the cornerstone of CNA since 1897. While much has changed during the last century, our commitment to these core values has not wavered. We strongly believe that proper business conduct is more than the practice of avoiding wrong; it is also a matter of choosing to do right. Nowhere is this more essential than helping in the fight against terrorism. As such, we are committed to complying with U.S. Department of Treasury Office of Foreign Asset Control (OFAC) requirements.

Through a variety of laws, OFAC administers and enforces economic sanctions against countries and groups of individuals, such as terrorists and narcotics traffickers. These laws prohibit <u>all</u> United States citizens (including corporations and other entities) and permanent residents from engaging in transactions with sanctioned countries and with individuals and entities on the Specially Designated Nationals (SDN) list. Because all U.S. citizens and companies are subject to this law, we wanted to be sure you were aware of its scope and restrictions. If you haven't already done so, you may want to consider discussing this issue with your legal counsel to ensure you are in compliance.

For insurance companies, accepting premium from, issuing a policy to, insuring property of, or making a claim payment to an individual or entity that is the subject of U.S.-imposed economic sanctions or trade embargoes usually are violations of these laws and regulations. Fines for violating OFAC requirements can be substantial. CNA has established an OFAC compliance program part which includes the use of exclusionary policy language. We believe this makes good business sense for CNA and you.

Our records indicate that you have insurance coverage coming up for renewal with us. The purpose of this letter is to advise you that your renewal policy includes OFAC exclusionary policy language, which may reduce or eliminate certain coverage. Specifically, if it is determined that your policy violates certain Federal or State laws or regulations, such as the U.S. list of Specially Designated Nationals or Blocked Persons (organizations or individuals associated with terrorist groups), any term or condition of your policy will be null and void to the extent it violates the applicable laws or regulations of the United States.

We're sure you share our commitment to compliance and thank you for your cooperation.

Your policy language reads as follows:

**ECONOMIC AND TRADE SANCTIONS CONDITION**

The following condition is added to the Policy:

**ECONOMIC AND TRADE SANCTIONS CONDITION**

In accordance with laws and regulations of the United States concerning economic and trade embargoes, this policy is void from its inception with respect to any term or condition of this policy that violates any laws or regulations of the United States concerning economic and trade embargoes including, but not limited to the following:

1.  Any insured under this Policy, or any person or entity claiming the benefits of such insured, who is or becomes a Specially Designated National or Blocked Person or who is otherwise subject to U.S. economic or trade sanctions;

2.  Any claim or suit that is brought in a Sanctioned Country or by a Sanctioned Country Government, where any action in connection with such claim or suit is prohibited by U.S. economic or trade sanctions;

3.  Any claim or suit that is brought by any Specially Designated National or Blocked Person or any person or entity who is otherwise subject to U.S. economic or trade sanctions;

---

ENDORSEMENT NUMBER: 6
POLICY NUMBER: 267870255
ISSUED TO: Law Offices of Stanley H. Goldschmidt, P.C.

G-145125-A  (ED. 08/03)
Page 1 of 2



4.     Property that is located in a Sanctioned Country or that is owned by, rented to or in the care, custody or control of a Sanctioned Country Government, where any activities related to such property are prohibited by U.S. economic or trade sanctions; or

5.     Property that is owned by, rented to or in the care, custody or control of a Specially Designated National or Blocked Person, or any person or entity who is otherwise subject to U.S. economic or trade sanctions.

As used in this endorsement a Specially Designated National or Blocked Person is any person or entity that is on the list of Specially Designated Nationals and Blocked Persons issued by the U.S. Treasury Department's Office of Foreign Asset Control (O.F.A.C.) as it may be from time to time amended.

As used in this endorsement a Sanctioned Country is any country that is the subject of trade or economic embargoes imposed by the laws or regulations of the United States of America.

ENDORSEMENT NUMBER: 6
POLICY NUMBER: 267870255
ISSUED TO: Law Offices of Stanley H. Goldschmidt, P.C.
EFFECTIVE DATE OF ENDORSEMENT: 05/01/2005

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated insurers, takes effect on the effective date of said Policy at the hour stated in said Policy and expires concurrently with said Policy unless another effective date is shown above.

By Authorized Representative
(No signature is required if this endorsement is issued with the Policy or if it is effective on the Policy Effective Date)

G-145125-A (ED. 08/03)
Page 2 of 2

 



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**ECONOMIC AND TRADE SANCTIONS CONDITION**

The following condition is added to the Policy:

**ECONOMIC AND TRADE SANCTIONS CONDITION**

In accordance with laws and regulations of the United States concerning economic and trade embargoes, this policy is void from its inception with respect to any term or condition of this policy that violates any laws or regulations of the United States concerning economic and trade embargoes including, but not limited to the following:

1.  Any insured under this Policy, or any person or entity claiming the benefits of such insured, who is or becomes a Specially Designated National or Blocked Person or who is otherwise subject to U.S. economic or trade sanctions;

2.  Any claim or suit that is brought in a Sanctioned Country or by a Sanctioned Country Government, where any action in connection with such claim or suit is prohibited by U.S. economic or trade sanctions;

3.  Any claim or suit that is brought by any Specially Designated National or Blocked Person or any person or entity who is otherwise subject to U.S. economic or trade sanctions;

4.  Property that is located in a Sanctioned Country or that is owned by, rented to or in the care, custody or control of a Sanctioned Country Government, where any activities related to such property are prohibited by U.S. economic or trade sanctions; or

5.  Property that is owned by, rented to or in the care, custody or control of a Specially Designated National or Blocked Person, or any person or entity who is otherwise subject to U.S. economic or trade sanctions.

As used in this endorsement a Specially Designated National or Blocked Person is any person or entity that is on the list of Specially Designated Nationals and Blocked Persons issued by the U.S. Treasury Department's Office of Foreign Asset Control (O.F.A.C.) as it may be from time to time amended.

As used in this endorsement a Sanctioned Country is any country that is the subject of trade or economic embargoes imposed by the laws or regulations of the United States of America.

ENDORSEMENT NUMBER: 7
POLICY NUMBER: 267870255
ISSUED TO: Law Offices of Stanley H. Goldschmidt, P.C.
EFFECTIVE DATE OF ENDORSEMENT: 05/01/2005

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy and expires concurrently with said Policy unless another effective date is shown above.

By Authorized Representative _____
.(No signature is required if this endorsement is issued with the Policy or if it is effective on the Policy Effective Date)

G-145184-A (Ed. 6/03)
Page 1 of 1



**Continental Casualty Company**
**CNA PLAZA**
**CHICAGO, ILLINOIS 60685**

**LAWYERS PROFESSIONAL LIABILITY**

**CANCELLATION ENDORSEMENT**

It is understood and agreed that, in consideration of the return amount stated below, the Policy referenced below is cancelled in accordance with the terms and conditions of the Policy.

Return premium was computed as follows:

| | |
|---|---|
| $-6,193.00 | Premium |
| $0.00 | State Surcharge (if applicable) |
| $0.00 | Tax (if applicable) |
| $-6,193.00 | Total Return Amount |

All other provisions of this Policy remain unchanged.

---

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated insurers, takes effect on the effective date of said Policy at the hour stated in said Policy and expires concurrently with said Policy unless another effective date is shown below.

*Stuart J Hofman*

By Authorized Representative
(No signature is required issued with the Policy or if it is effective on the Policy Effective Date)

---

Policy No:    267870255
Endorsement No:   1
Effective Date:   07/01/2005

**CONTINENTAL CASUALTY COMPANY**
**CNA PLAZA**
**CHICAGO, ILLINOIS 60685**

---

**LAWYERS PROFESSIONAL LIABILITY POLICY**

---

*Words and phrases that appear in bold are defined in the Definitions section of this Policy.*

**THIS IS A CLAIMS MADE AND REPORTED POLICY. IT APPLIES ONLY TO THOSE CLAIMS THAT ARE BOTH FIRST MADE AGAINST THE INSURED AND REPORTED IN WRITING TO THE COMPANY DURING THE POLICY PERIOD. PLEASE REVIEW THIS POLICY CAREFULLY AND DISCUSS THIS COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.**

I.    **INSURING AGREEMENT**

    A.    Coverage

        The **Company** agrees to pay on behalf of the **Insured** all sums in excess of the deductible that the **Insured** shall become legally obligated to pay as **damages** and **claim expenses** because of a **claim** that is both first made against the **Insured** and reported in writing to the **Company** during the **policy period** by reason of an act or omission in the performance of **legal services** by the **Insured** or by any person for whom the **Insured** is legally liable, provided that:

        1.    the **Insured** did not give notice to a **prior insurer** of such **claim** or a related **claim**;

        2.    the **Insured** did not give notice to a **prior insurer** of any such act or omission or related act or omission;

        3.    prior to:

            a.    the inception date of the first policy issued by the **Company** or any subsidiary or affiliate of the **Company**, if continuously renewed; or,

            b.    the date the **Insured** first became a member or employee of the **Named Insured** or predecessor firm,

        whichever is later, no **Insured** had a basis to believe that any such act or omission, or related act or omission, might reasonably be expected to be the basis of a **claim**;

        4.    there is no other policy, whether primary, contributory, excess, contingent or otherwise, which provides insurance to any **Insured** for the **claim** based on or arising out of an act or omission in the performance of

legal services by such **Insured** or by any person for whom the **Insured** is legally liable while affiliated with a firm other than the **Named Insured**.

### B. Defense

The **Company** shall have the right and duty to defend in the **Insured's** name and on the **Insured's** behalf a **claim** covered by this Policy even if any of the allegations of the **claim** are groundless, false or fraudulent. The **Company** shall have the right to appoint counsel and to make such investigation and defense of a **claim** as is deemed necessary by the **Company**. If a **claim** shall be subject to arbitration or mediation, the **Company** shall be entitled to exercise all of the **Insured's** rights in the choice of arbitrators or mediators and in the conduct of an arbitration or mediation proceeding.

### C. Settlement

The **Company** shall not settle a **claim** without the written consent of the **Named Insured**. If the **Named Insured** refuses to consent to a settlement or compromise recommended by the **Company** and acceptable to the claimant, then the **Company's** limit of liability under this Policy shall be reduced to the amount for which the **claim** could have been settled plus all **claim** expenses incurred up to the time the **Company** made its recommendation, which amount shall not exceed the remainder of the limit of liability specified in Section II.A.

### D. Exhaustion of limits

The **Company** is not obligated to investigate, defend, pay or settle, or continue to investigate, defend, pay or settle a **claim** after the applicable limit of the **Company's** liability has been exhausted by payment of damages or **claim** expenses or by any combination thereof or after the **Company** has deposited the remaining available limits of liability into a court of competent jurisdiction. In such case, the **Company** shall have the right to withdraw from the further investigation, defense, payment or settlement of such **claim** by tendering control of said investigation, defense or settlement of the **claim** to the **Insured**.

## II. LIMITS OF LIABILITY AND DEDUCTIBLE

### A. Limit of liability - each claim

Subject to paragraph B. below, the limit of liability of the **Company** for damages and **claim** expenses for each **claim** first made against the **Insured** and reported to the **Company** during the **policy period** shall not exceed the amount stated in the Declarations for each **claim**.

G-118011-A
Ed. 7/01

B.    Limit of liability - in the aggregate

The limit of liability of the Company for damages and claim expenses for all claims first made against the Insured and reported to the Company during the policy period shall not exceed the amount stated in the Declarations as the aggregate.

C.    Deductible

The deductible amount stated in the Declarations is the total amount of the Insured's liability for all claims and applies to the payment of damages and claim expenses for claims first made and reported to the Company in writing during the policy period. The deductible shall be paid by the Named Insured, or upon the Named Insured's failure to pay, jointly and severally by all Insureds. The limits of liability set forth in the Declarations are in addition to and in excess of the deductible.

D.    Multiple insureds, claims and claimants

The limits of liability shown in the Declarations and subject to the provisions of this Policy is the amount the Company will pay as damages and claim expenses regardless of the number of Insureds, claims made or persons or entities making claims. If related claims are subsequently made against the Insured and reported to the Company, all such related claims, whenever made, shall be considered a single claim first made and reported to the Company within the policy period in which the earliest of the related claims was first made and reported to the Company.

E.    Supplementary payments

Although not Damages, the Company will pay, in addition to the applicable limit of liability:

1.    up to $500.00 for loss of earnings to each Insured for each day or part of a day of such Insured's attendance, at the Company's request, at a trial, hearing or arbitration proceeding involving a claim against such Insured, but in no event shall the amount payable hereunder exceed $10,000.00 per Insured despite the number of days the Insured is in attendance, or the number of trials, hearings or arbitration proceedings that the Insured is required to attend. In no event shall the amount payable hereunder exceed $10,000.00 despite the number of Insureds hereunder or the number of such proceedings.

G-118011-A
Ed. 7/01

3

2.    up to $10,000.00 for any **Insured** and in the aggregate, for attorney fees and other reasonable costs, expenses or fees (the **"Disciplinary Fees"**)resulting from a **Disciplinary Proceeding** incurred as the result of a notice of such **Disciplinary Proceeding** both first received by the **Insured** and reported to the **Company** during the **policy period**, arising out of an act or omission in the rendering of legal services by such **Insured**. Except as set forth below, the amount payable hereunder shall not exceed $10,000.00 despite the number of **Insureds** hereunder or the number of such proceedings.

In the event of a determination of **No Liability** of the **Insured** against whom the **Disciplinary Proceeding** has been brought, the **Company** shall reimburse such **Insured** for Disciplinary Fees, including those in excess of the $10,000 cap set forth above, up to $100,000. In no event shall the amount payable hereunder exceed $100,000 despite the number of **Insureds** hereunder or the number of such proceedings.

F:    Risk Management Incentives

    1.    Mediation

If mediation of a **claim** takes place either without institution of arbitration proceeding or service of suit or within 60 days of the institution of such proceedings or service of suit, and such **claim** is ultimately resolved for an amount acceptable to the **Insured** and the **Company** by the process of mediation, the **Insured's** deductible, applying to the **claim**, will be reduced by 50%. In no event shall the amount of the deductible waived hereunder exceed $25,000.

    2.    Subpoena Assistance

In the event the **Insured** receives a subpoena for documents or testimony arising out of legal services rendered by the **Insured** and the **Insured** would like the **Company's** assistance in responding to the subpoena, the **Insured** may provide the **Company** with a copy of the subpoena and the **Company** will retain an attorney to provide advice regarding the production of documents, to prepare the **Insured** for sworn testimony, and to represent the **Insured** at the **Insured's** depositions, provided that:

    a.    the subpoena arises out of a lawsuit to which the **Insured** is not a party; and

    b.    the **Insured** has not been engaged to provide advice or testimony in connection with the lawsuit, nor has the **Insured** provided such advice or testimony in the past.

G-118011-A
Ed. 7/01

4

Such legal counsel's fees incurred under this provision are in addition to the limits of liability and are not applicable to the deductible. Any notice the **Insured** gives the **Company** of such subpoena shall be deemed notification of a potential claim under Section V.A. of this Policy.

III.    DEFINITIONS

Wherever used in this Policy:

A.    **"Bodily injury"** means injury to the body, sickness or disease sustained by any person, including death resulting from such injuries; or mental injury, mental anguish, mental tension, emotional distress, pain or suffering or shock sustained by any person whether or not resulting from injury to the body, sickness, disease or death of any person.

B.    **"Claim"** means a demand received by the **Insured** for money or services arising out of an act or omission, including **personal injury**, in the rendering of or failure to render **legal services**. A demand shall include the service of suit or the institution of an arbitration proceeding against the **Insured**.

C.    **"Claim expenses"** mean:
  1.    fees charged by attorneys designated by the **Company** or by the **Insured** with the **Company's** written consent; and
  2.    all other reasonable and necessary fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a **claim** if incurred by the **Company**, or by the **Insured** with the written consent of the **Company**, including, but not limited to, premiums for any appeal bond, attachment bond or similar bond but without any obligation of the **Company** to apply for or furnish any such bond.

**Claim expenses** with respect to a **claim** will be paid first and payment will reduce the amount available to pay damages. **Claim expenses** shall not include fees, costs or expenses of employees or officers of the **Company**. Nor shall **claim expenses** include salaries, loss of earnings or other remuneration by or to any **Insured**.

D.    **"Company"** means the insurance company named in the Declarations.

E.    **"Damages"** mean judgments, awards and settlements, provided any settlement is negotiated with the assistance and approval of the **Company**. **Damages** do not include:
  1.    legal fees, costs and expenses paid or incurred or charged by the

Insured, no matter whether claimed as restitution of specific funds, forfeiture, financial loss, set-off or otherwise, and injuries that are a consequence of any of the foregoing;

2. civil or criminal fines, sanctions, penalties or forfeitures, whether pursuant to law, statute, regulation or court rule, including but not limited to awards under 18 U.S.C. §1961, et. seq., Federal Rules of Civil Procedure 11 or 28 U.S.C. §1927 and state statutes, regulations, rules or law so providing, and injuries that are a consequence of any of the foregoing;

3. punitive or exemplary amounts;

4. the multiplied portion of multiplied awards;

5. injunctive or declaratory relief;

6. amounts for which the Insured is not financially liable or that are without legal recourse to the Insured.

F. **"Disciplinary Proceeding"** means any proceeding before a state or federal licensing board or a peer review committee to investigate charges alleging professional misconduct.

G. **"Insured"** means the Named Insured, predecessor firm and the persons or entities described below:

1. any lawyer, partnership, professional corporation, professional association, limited liability corporation or limited liability partnership who is or becomes a partner, officer, director, stockholder-employee, associate, manager, member or salaried employee of the Named Insured during the policy period shown in the Declarations.

2. any lawyer previously affiliated with the Named Insured or a predecessor firm as a partner, officer, director, stockholder-employee, associate, manager, member or salaried employee but only for legal services performed on behalf of the Named Insured or a predecessor firm at the time of such affiliation. The term "previously affiliated" as used herein does not include a lawyer who, during the policy period and while affiliated with the Named Insured: a) voluntarily ceases, permanently and totally, the private practice of law; or b) dies or becomes totally and permanently disabled. Such an lawyer will be deemed to be an Insured under paragraph one above;

3. any lawyer, law firm, partnership, professional corporation, professional association, limited liability corporation or limited liability partnership who acts as Of Counsel to the Named Insured or any non-employee independent contractor attorney to the Named Insured, but only for legal services rendered on behalf of the Named Insured and only if a fee inured to the Named Insured except that no fee need inure to the Named Insured where eleemosynary (pro bono) legal services are rendered by such Of Counsel Insured where at the time of retention, there was

G-118011-A
Ed.7/01

6

approval by the appropriate committee or lawyer within the **Named Insured** as a matter that would be handled without compensation. Any lawyer, law firm, partnership, professional corporation, professional association, limited liability corporation or limited liability partnership who acts as Of Counsel to the **Named Insured**, who previously qualified as an **Insured** under paragraph 1 above, but left the full time practice of law to practice exclusively as Of Counsel to the **Named Insured**, will be deemed to be an **Insured** under paragraph 1 above.

4.  any person who is a former or current employee, other than an employed lawyer, of the **Named Insured** or any **predecessor firm**, but solely for services performed by such person within the course and scope of their employment by the **Named Insured** or any **predecessor firm** and provided that the services in dispute are **legal services** of the **Named Insured** or any **predecessor firm**;

5.  the estate, heirs, executors, administrators, assigns and legal representatives of an **Insured** in the event of such **Insured's** death, incapacity, insolvency or bankruptcy, but only to the extent that such **Insured** would have been provided coverage under this Policy.

H.   "**Legal services**" mean:

1.  those services performed by an **Insured** for others as a lawyer, arbitrator, mediator, title agent or as a notary public. Any title agency or company, on whose behalf the **Insured** acts as title agent or designated issuing attorney, is not an **Insured** under this Policy;

2.  those services performed by an **Insured** as an administrator, conservator, receiver, executor, guardian, trustee or in any other fiduciary capacity and any investment advice given in connection with such services.

I.   "**Named Insured**" means the persons and entities designated in the Declarations.

J.   "**No Liability**" means a final determination of no liability in favor of the **Insured** who is the subject of a **Disciplinary Proceeding**. In no event shall the term "**No Liability**" apply to a **Disciplinary Proceeding** for which a settlement has occurred, a determination of no further action is made, or the matter is abandoned by the disciplinary authority.

K.   "**Personal injury**" is an injury resulting from an act or omission arising out of: false arrest, detention, or imprisonment; wrongful entry, or eviction, or other invasion of the right of private occupancy; libel, slander, or other disparaging or defamatory materials; a writing or saying in violation of an individual's right to privacy; malicious prosecution or abuse of process.

L.   "**Policy period**" means the period of time between the inception date and time

G-118011-A
Ed.7/01

7

shown in the Declarations and the date and time of termination, expiration or cancellation of this Policy.

M.  **"Predecessor firm"** means any entity which has undergone dissolution and is named as such on the Declarations.

N.  **"Prior insurer"** means an insurer, including the **Company** and any subsidiary or affiliate of the **Company**, who has issued a lawyers professional liability insurance policy that is applicable to a **claim**, such policy having an inception date prior to the **policy period**.

O.  **"Related acts or omissions"** mean all acts or omissions in the rendering of **legal services** that are temporally, logically or causally connected by any common fact, circumstance, situation, transaction, event, advice or decision.

P.  **"Related claims"** mean all **claims** arising out of a single act or omission or arising out of **related acts or omissions** in the rendering of **legal services**.

Q.  **"Totally and permanently disabled"** means that an **Insured** is so disabled as to be wholly prevented from rendering **legal services** provided that such disability:
1.  has existed continuously for not less than six (6) months; and
2.  is reasonably expected to be continuous and permanent.

## IV.  EXCLUSIONS

This Policy does not apply:

A.  to any **claim** based on or arising out of any dishonest, fraudulent, criminal or malicious act or omission by an **Insured** except that this exclusion shall not apply to **personal injury**. The **Company** shall provide the **Insured** with a defense of such **claim** unless or until the dishonest, fraudulent, criminal or malicious act or omission has been determined by any trial verdict, court ruling, regulatory ruling or legal admission, whether appealed or not. Such defense will not waive any of the **Company's** rights under this Policy. Criminal proceedings are not covered under this Policy regardless of the allegations made against the **Insured**;

B.  to any **claim** for **bodily injury**, or injury to, or destruction of, any tangible property, including the loss of use resulting therefrom except that the exclusion of **bodily injury** does not apply to mental injury, mental anguish, mental tension, or emotional distress caused by **personal injury**;

G-118011-A
Ed.7/01

8

C.    to any loss sustained by an **Insured** or **claim** made against an **Insured** as beneficiary or distributee of any trust or estate;

D.    to any **claim** based on or arising out of the **Insured's** alleged liability under any oral or written contract or agreement, unless such liability would have attached to the **Insured** in the absence of such agreement;

E.    to any **claim** by or on behalf of an **Insured** under this Policy against any other **Insured** hereunder unless such **claim** arises out of legal services by an **Insured** rendered to such other **Insured** as a client;

F.    to any **claim** based on or arising out of an **Insured's** capacity as:
1.    a former, existing or prospective officer, director, shareholder, partner or manager of a business enterprise or charitable organization (if the above are not named in the Declarations); or
2.    a former, existing or prospective officer, director, shareholder, partner manager, or trustee of a fund or trust which is a pension, welfare, profit-sharing, mutual or investment fund or trust; or
3.    a fiduciary under the Employee Retirement Income Security Act of 1974 and its amendments or any regulation or order issued pursuant thereto or any other similar state or local law;
except that this exclusion shall not apply to a **claim** based on or arising out of an **Insured's** capacity as a member, director or officer of any professional legal association, its governing board or any of its committees.

G.    to any **claim** based on or arising out of an **Insured's** capacity as a public official or an employee or representative of a governmental body, subdivision or agency unless the **Insured** is deemed as a matter of law to be a public official or employee or representative of such entity solely by virtue of rendering legal services to it;

H.    to any **claim** based on or arising out of legal services performed for any existing or prospective partnership, organization, corporation, company or other business enterprise (including the ownership, maintenance or care of any property in connection therewith), not named in the Declarations, if at the time of the act or omission giving rise to such **claim**:
1.    any **Insured** controlled, operated or managed or intended to control, operate or manage such enterprise; or
2.    any **Insured** was :
   a.    a partner or employee of such enterprise, or
   b.    more than a 10% shareholder or a sole proprietor of such enterprise, or
3.    **Insureds** cumulatively were more than a 10% shareholder of such enterprise,

G-118011-A
Ed. 7/01

9

except that this exclusion shall not apply to any claim based on or arising out of legal services to any professional legal association, its governing board or any of its committees. As used in this exclusion, the word "partner" shall be deemed to include members of limited liability companies or limited liability partnerships;

V.    CONDITIONS

A.    Notice of claims and potential claims

    1.    The Insured, as a condition precedent to the obligations of the Company under this Policy, shall immediately give written notice to the Company during the policy period:
        a.    of any claim made against the Insured;
        b.    of the Insured's receipt of any notice, advice or threat, whether written or verbal, that any person or organization intends to hold the Insured responsible for any alleged breach of duty.

    2.    If during the policy period the Insured shall become aware of any act or omission that may reasonably be expected to be the basis of a claim against the Insured and gives written notice to the Company of such act or omission and the reasons for anticipating a claim, with full particulars, including but not limited to:
        a.    the specific act or omission;
        b.    the dates and persons involved;
        c.    the identity of anticipated or possible claimants;
        d.    the circumstances by which the Insured first became aware of the possible claim,
then any such claim that is subsequently made against the Insured and reported to the Company shall be deemed to have been made at the time such written notice was given to the Company.

B.    Innocent Insured

Whenever coverage under this Policy would be excluded, suspended or lost because of any exclusion relating to criminal, dishonest, fraudulent, or malicious conduct by any person insured hereunder, the Company agrees that such insurance, as would otherwise be afforded under this Policy, shall be applicable with respect to an Insured who did not personally participate or personally acquiesce in or remain passive (including failure to give timely notice) after having knowledge of such conduct. The Company's obligation to pay damages under this Condition B will be excess of the full extent of the assets of any Insured involved in such criminal, dishonest, fraudulent, or malicious conduct.

G-118011-A
Ed.7/01

10

C.     Reimbursement of the Company

If the Company, in the exercise of its discretion and without any obligation to do so, pays any amount in excess of the applicable limits of liability or within the amount of the deductible, the Named Insured, or upon the Named Insured's failure to pay, the Insureds, jointly and severally, shall be liable to the Company for any and all such amounts and, upon demand, shall pay such amounts to the Company.

D.     Territory

This Policy applies to an act or omission taking place anywhere in the world, provided that the claim is made and suit is brought against the Insured within the United States of America, including its territories, possessions, Puerto Rico or Canada.

E.     Alternative dispute resolution

After the final adjudication or settlement of a claim, any dispute concerning allegations of bad faith or tort against the Company regarding the appropriateness or value of any settlement or final disposition of any claim that exceeds the deductible may be submitted to any form of alternative dispute resolution acceptable to the Company and the Insured. Should the Company and the Insured be unable to agree on the form of alternative dispute resolution, then such dispute shall be submitted to binding arbitration. Except as set forth below, the rules of the American Arbitration Association shall apply. The arbitration panel shall consist of one arbitrator selected by the Company, one arbitrator selected by the Insured, and one arbitrator selected by the first two arbitrators. If the two arbitrators selected cannot agree on a third arbitrator, then the American Arbitration Association shall appoint an arbitrator.

F.     Other insurance

If there is other insurance that applies to the claim:

1.     on a claims made basis, this insurance shall be excess over such other valid and collectible insurance whether such insurance is stated to be primary, contributory, excess, contingent or otherwise. This does not apply to insurance that is purchased by the Named Insured specifically to apply in excess of this insurance.

2.     on an occurrence basis, this insurance shall be available in the amount by which the limit of liability for this Policy exceeds the applicable limit of liability of such other valid and collectible insurance. The difference shall be the maximum the Company shall pay under this Policy with

G-118011-A
Ed. 7/01

11

respect to a **claim.** If the applicable limit of liability of such other valid and collectible insurance is equal to or greater than the maximum payable under this Policy, then this Policy shall not afford any insurance with respect to such **claim.**

G.    Assistance and cooperation of the **Insured**

1.    The **Insured** shall cooperate with the **Company** and, upon the **Company's** request, shall attend hearings and trials and shall assist in effecting settlements, securing and giving of evidence, obtaining the attendance of witnesses, and the conduct of suits and proceedings in connection with a **claim.**

2.    The **Insured** shall assist in the enforcement of any right of contribution or indemnity against any person or organization who or which may be liable to any **Insured** in connection with a **claim.**

3.    The **Insured** shall not, except at its own cost, voluntarily make any payment, assume or admit any liability or incur any expense without the consent of the **Company.**

H.    Action against the **Company**

No action shall lie against the **Company** unless, as a condition precedent thereto:

1.    there shall have been full compliance with all the terms of this Policy; and

2.    the **Insured's** obligation to pay shall have been finally determined either by judgment against the **Insured** after actual trial or by written agreement of the **Insured,** the claimant and the **Company.**

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this Policy to the extent of the insurance afforded by this Policy. No person or organization shall have any right under this Policy to join the **Company** as a party to any action against an **Insured,** nor shall the **Company** be impleaded by the **Insured** or his legal representative. Bankruptcy or insolvency of the **Insured** or of the **Insured's** estate shall not relieve the **Company** of any of its obligations hereunder.

I.    Subrogation

In the event of any payment under this Policy, the **Company** shall be subrogated to all the **Insured's** rights of recovery thereof against any person or organization, including any rights such **Insured** may have against any other **Insured** involved in dishonest, fraudulent, criminal, malicious or intentional conduct. The **Insured** shall execute and deliver instruments and papers and do whatever else is

G-118011-A
Ed.7/01

12

necessary to secure and collect upon such rights. The **Insured** shall do nothing to prejudice such rights.

**J.**    Changes

Notice to any of the **Company's** agents or knowledge possessed by any such agent or any other person shall not act as a waiver or change in any part of this **Policy.** It also will not prevent the **Company** from asserting any rights under the provisions of this **Policy.** None of the provisions of this **Policy** will be waived, changed or modified except by written endorsement, signed by the **Company,** issued to form a part of this **Policy.**

**K.**    Assignment

No assignment of interest of the **Insured** under this **Policy** shall be valid, unless the written consent of the **Company** is endorsed hereon.

**L.**    Cancellation/ Nonrenewal

1.    This **Policy** may be canceled by the **Named Insured** by returning it to the **Company.** The **Named Insured** may also cancel this **Policy** by written notice to the **Company** stating at what future date cancellation is to be effective.

2.    The **Company** may cancel or non-renew this **Policy** by written notice to the **Named Insured** at the address last known to the **Company.** The **Company** will provide written notice at least sixty (60) days before cancellation or non-renewal is to be effective. If the **Company** cancels this **Policy** because the **Insured** has failed to pay a premium when due or has failed to pay amounts in excess of the limit of the **Company's** liability or within the amount of the deductible, this **Policy** may be canceled by the **Company** by mailing to the **Named Insured** written notice stating when, not less than ten (10) days thereafter, such cancellation shall be effective. The time of surrender of this **Policy** or the effective date and hour of cancellation stated in the notice shall become the end of the **policy period.** Delivery (where permitted by law) of such written notice either by the **Named Insured** or by the **Company** shall be equivalent to mailing.

3.    If the **Company** cancels this **Policy,** the earned premium shall be computed pro rata. If the **Named Insured** cancels this **Policy,** the **Company** shall retain the customary short rate proportion of the premium. Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

4.    The offering of terms and conditions different from the expiring terms and conditions shall not constitute a refusal to renew.

G-118011-A
Ed.7/01

13

M.  Entire contract

By acceptance of this Policy the **Insured** agrees that:

1.  all of the information and statements provided to the **Company** by the **Insured** are true, accurate and complete and shall be deemed to constitute material representations made by all of the **Insureds**;

2.  this Policy is issued in reliance upon the **Insured's** representations;

3.  this Policy, endorsements thereto, together with the completed and signed application and any and all supplementary information and statements provided by the **Insured** to the **Company** (all of which are deemed to be incorporated herein) embody all of the agreements existing between the **Insured** and the **Company** and shall constitute the entire contract between the **Insured** and the **Company**; and

4.  the misrepresentation of any material matter by the **Insured** or the **Insured's** agent will render this Policy null and void and relieve the **Company** from all liability herein.

N.  Named Insured sole agent

The **Named Insured** shall be the sole agent of all **Insureds** hereunder for the purpose of effecting or accepting any notices hereunder, any amendments to or cancellation of this Policy, for the completing of any applications and the making of any statements, representations and warranties, for the payment of any premium and the receipt of any return premium that may become due under this Policy, and the exercising or declining to exercise any right under this Policy.

O.  Liberalization

If the **Company** adopts any revision that would broaden coverage under this policy form G-118011-A without additional premium at any time during the policy period, the broadened coverage will immediately apply to this Policy except that it will not apply to claims that were first made against the **Insured** prior to the effective date of such revision.

P.  Notices

Any notices required to be given by an **Insured** shall be submitted in writing to the **Company** or its authorized representative. If mailed, the date of mailing of such notice shall be deemed to be the date such notice was given and proof of mailing shall be sufficient proof of notice.

## VI.  EXTENDED REPORTING PERIODS

G-118011-A
Ed.7/01

14

As used herein, "extended reporting period" means the period of time after the end of the policy period for reporting claims by reason of an act or omission that occurred prior to the end of the policy period and is otherwise covered by this Policy.

A.     **Automatic extended reporting period**

If this Policy is canceled or non-renewed by either the **Company** or by the **Named Insured**, the **Company** will provide to the **Named Insured** an automatic, non-cancelable extended reporting period starting at the termination of the policy period if the **Named Insured** has not obtained another policy of lawyers professional liability insurance within sixty (60) days of the termination of this Policy. This automatic extended reporting period will terminate after sixty (60) days.

B.     **Optional extended reporting period**

1.     If this Policy is canceled or non-renewed by either the **Company** or by the **Named Insured**, then the **Named Insured** shall have the right to purchase an optional extended reporting period. Such right must be exercised by the **Named Insured** within sixty (60) days of the termination of the policy period by providing:
   a.     written notice to the **Company**; and
   b.     with the written notice, the amount of additional premium described below.

2.     The additional premium for the optional extended reporting period shall be based upon the rates for such coverage in effect on the date this Policy was issued or last renewed and shall be for one (1) year at 100% of such premium; two (2) years at $150% of such premium; three (3) years at 175% of such premium; six (6) years at 225% of such premium; or, for an unlimited period at 250% of such premium.

C.     **Death or disability extended reporting period**

1.     If an **Insured** dies or becomes **totally and permanently disabled** during the policy period, then upon the latter of the expiration of: the policy period; any renewal or successive renewal of this Policy; or any automatic or optional extended reporting period, such **Insured** shall be provided with a death or disability extended reporting period as provided below.
   a.     In the event of death, such **Insured's** estate, heirs, executors or administrators must, within sixty (60) days of the expiration of the policy period, provide the **Company** with written proof of the date of death. This extended reporting period is provided to the estate, heirs, executors and administrators of such **Insured**.
   b.     If an **Insured** becomes **totally and permanently disabled**, such

G-118011-A
Ed.7/01

15

Insured or Insured's legal guardian must, within sixty (60) days of the expiration of the policy period, provide the Company with written proof that such Insured is totally and permanently disabled, including the date the disability commenced, certified by the Insured's physician. The Company retains the right to contest the certification made by the Insured's physician, and it is a condition precedent to this coverage that the Insured agree to submit to medical examinations by any physician designated by the Company. This extended reporting period is provided until such Insured shall no longer be totally or permanently disabled or until the death of such Insured in which case subparagraph a. hereof shall apply.

2. No additional premium will be charged for any death or disability extended reporting period.

D. Non-practicing extended reporting period

1. If an Insured retires or otherwise voluntarily ceases, permanently and totally, the private practice of law during the policy period and has been continuously insured by the Company for at least three consecutive years, then such Insured shall be provided with an extended reporting period commencing upon the latter of the expiration of: the policy period; any renewal or successive renewal of this Policy; or any automatic or optional extended reporting period.

2. This extended reporting period is provided until the death of such Insured in which case subparagraph C.1. hereof shall apply or, until such Insured shall resume the practice of law.

3. No additional premium will be charged for any non-practicing extended reporting period.

E. Extended reporting periods limits of liability

1. Automatic and optional extended reporting periods limits of liability

a. Where the Company has the right to nonrenew or cancel this Policy and it exercises that right, then the Company's liability for all claims reported during the automatic and optional extended reporting periods shall be part of and not in addition to the limits of liability for the policy period as set forth in the Declarations and Section II, Limits of Liability of this Policy.

b. If this Policy is canceled by the Named Insured or if the Company offers to renew this Policy, and the Named Insured refuses such renewal offer, then the Company's liability for all

G-118011-A
Ed. 7/01

claims reported during the automatic and optional **extended reporting periods** shall be reinstated to the limits of liability applicable to this Policy as set forth in Section II.A. and B. hereof.

2. Separate death or disability and non-practicing **extended reporting period** limits of liability

    a.    Limit of Liability - Each **"Claim"**

Subject to paragraph B. below, the **Company's** limit of liability for each claim first made against the Insured, and reported to the **Company** during the death or disability **extended reporting period** or non-practicing **extended reporting period**, shall not exceed the amount stated in the declarations as the **"Each Claim Death or Disability and Non-Practicing extended reporting period limit of liability"**.

    b. Limit of Liability - In the Aggregate

The limit of liability of the **Company** for all **claims** first made against the **Insured**, and reported to the **Company** during the death or disability **extended reporting period** or non-practicing **extended reporting period**, shall not exceed the amount stated in the Declarations as the **"Aggregate Death or Disability and Non-Practicing extended reporting period limit of liability"**.

F.    Elimination of right to any extended reporting period

There is no right to any extended reporting period:
1.    if the **Company** shall cancel or refuse to renew this Policy due to:
    a.    non-payment of premiums; or
    b.    non-compliance by an **Insured** with any of the terms and conditions of this Policy; or
    c.    any misrepresentation or omission in the application for this Policy; or,
2.    if at the time this right could be exercised by an **Insured**, such **Insured's** right to practice law has been revoked, suspended or surrendered at the request of any regulatory authority for reasons other than that the **Insured is totally and permanently disabled.**

G.    Extended reporting period not a new policy

It is understood and agreed that the **extended reporting period** shall not be construed to be a new policy and any **claim** submitted during such period shall otherwise be governed by this Policy.

G-118011-A
Ed.7/01

17

IN WITNESS WHEREOF, the Company has caused this Policy to be executed by its Chairman and Secretary, but this Policy shall not be binding upon the Company unless completed by the attachment of the Declarations and signed by a duly authorized representative of the Company.

Chairman of the Board _~Bernard L. Hirschberg~_     Secretary _~Judith M. Walter~_

G-118011-A
Ed. 7/01

18

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| In re )<br><br>RESTAURANT EQUIPMENT & SUPPLY )<br>DEPOT INC., )<br><br>Debtor )<br>_____ )<br><br>Bryan S. Ross Trustee, )<br><br>Plaintiff )<br>v. )<br><br>The Law Offices of Stanley H. Goldschmidt P.C. )<br><br>Serve: Stanley H. Goldschmidt )<br>     1025 Connecticut Ave N.W. )<br>     Suite 200 )<br>     Washington D.C. 20036 )<br>And )<br><br>Stanley H. Goldschmidt; )<br><br>Serve: Stanley H. Goldschmidt )<br>     1025 Connecticut Ave N.W. )<br>     Suite 200 )<br>     Washington D.C. 20036 )<br><br>Defendants. )<br>_____ ) | Case No. 05-01316<br>(Chapter 7)<br><br><br><br><br><br>Adv. Pro. No. _____ |

## COMPLAINT

The Plaintiff, Bryan S. Ross, trustee for the bankruptcy estate of Restaurant

Equipment and Supply Depot Inc., by and through his attorneys, Stinson Morrison

Hecker LLP, files this Adversary Complaint, stating:

## INTRODUCTORY STATEMENT

This legal malpractice action seeks damages arising out of the Defendants' breach of their contractual and professional duties while representing the Debtor in a pre-petition engagement. In sum, the Defendants failed to exercise that standard of care required of an attorney, by, at a minimum: (1) failing to keep the Debtor informed of significant developments in a lawsuit against the Debtor; (2) negligently misrepresenting the status of the lawsuit it was defending on behalf of the Debtor; (3) failing to exercise reasonable care in defending the lawsuit by failing to comply with court procedure and deadlines, resulting in the entry of a judgment against the Debtor in the amount of $836,238.99; and (4) charging the Debtor to correct errors committed by the Defendants.

## JURISDICTION AND VENUE

1.    The Debtor commenced this case on September 3, 2005 when it filed a petition for relief under Chapter 7 of the Bankruptcy Code ("Petition Date").

2.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. §§ 548 and 550.  This is a core proceeding under 28 U.S.C. § 157(b).

3.    Venue is proper in this district pursuant to 28 U.S.C. § 1409.

4.    Sections 548, 550(a) and 704(1) of the Bankruptcy Code ("Code") 11 U.S.C. §§ 101-1330, authorize the Trustee to bring this adversary proceeding. Pursuant to Section 541 of the Code, the Trustee owns any cause of action that could have been previously brought by the Debtor prior to bankruptcy.

## PARTIES

5.      The Debtor, Restaurant Equipment and Supply Depot Inc., ("Debtor") was

a District of Columbia corporation which previously operated a business in the District of

Columbia selling restaurant supplies with its principal place of business at 2101 New

York Avenue, N.E. Washington D.C.

6.      The Plaintiff, Bryan S. Ross, is the duly appointed, qualified and serving

Chapter 7 trustee ("Trustee"), of the bankruptcy estate of Restaurant Equipment and

Supply Depot Inc.

7.      The Defendant, the Law Offices of Stanley H. Goldschmidt P.C., was a

Maryland professional corporation and served as counsel to the Debtor and, upon

information and belief, previously conducted business in this District, and is an entity

over whom this Court may exercise jurisdiction.

8.      The Defendant, Stanley H. Goldschmidt ( all defendants are collectively

referred to as "Goldschmidt" or "Defendants"), was a shareholder of The Law Offices of

Stanley H. Goldschmidt P.C. and served as counsel to the Debtor and, upon information

and belief, previously conducted and still conducts business in this District, and is a

person over whom this Court may exercise jurisdiction.

9.      Upon information and belief, Defendant Stanley Goldschmidt is now

associated with the law firm of Roetzel & Andress, located and conducting business in

the District of Columbia.

10.      Upon information and belief, Defendant, The Law Offices of Stanley H.

Goldschmidt P.C., no longer conducts business in the District of Columbia and has

merged into the law firm of Roetzel & Andress.

## STATEMENT OF FACTS COMMON TO ALL COUNTS

*(a) The Superior Court Lawsuit.*

11.    On February 16, 2000, three employees of the Debtor filed a lawsuit in the Superior Court of the District of Columbia, styled *Osvaldo Gutierrez et al v. Restaurant Equipment and Supply Depot Inc.*, Case No. 01-774 ("Lawsuit").

12.    The Lawsuit alleged that the Debtor violated provisions of the District of Columbia Wage and Hours laws, the District of Columbia Human Rights Act, and alleged the Debtor committed a battery against one of the Plaintiffs.

13.    In or about February 2000, the Debtor entered into an agreement whereby Goldschmidt would represent the Debtor in the Lawsuit in exchange for compensation.

14.    On May 5, 2000, Goldschmidt filed a motion to dismiss the Lawsuit.

15.    On September 11, 2000, the trial court denied the Debtor's motion to dismiss.

16.    Pursuant to D.C. Super. Ct Rule 12, the denial of the motion to dismiss triggered the Debtor's obligation to answer the Lawsuit within ten days.

17.    Goldschmidt failed to answer the Lawsuit.

18.    On December 11, 2000, the Plaintiff requested the trial court enter a default judgment against the Debtor based upon its failure to answer.

19.    Goldschmidt failed to respond to the Plaintiffs' request for entry of default.

20.    On January 2, 2001, the trial court entered a default judgment as to liability against the Debtor.

4

21.    Following entry of the default judgment, Goldschmidt filed a motion to reconsider the entry of the default judgment and a motion to vacate the default judgment. The trial court denied both motions.

22.    Although Goldschmidt was aware of the entry of the default judgment, Goldschmidt failed to inform the Debtor.

23.    On April 23, 2001, the trial court held a six (6) day jury trial on the issue of damages to be awarded the Plaintiffs in light of the default judgment on liability.

24.    Goldschmidt represented the Debtor at the jury trial.

25.    Goldschmidt failed to inform the Debtor of the jury trial.

26.    Goldschmidt failed to call any witnesses including any representative of the Debtor at the jury trial.

27.    Goldschmidt failed to introduce any evidence on behalf of the Debtor at the jury trial.

28.    On May 1, 2001, the Court entered judgment on the jury verdict in favor of the Plaintiffs and against the Debtor in the total amount of $836,238.99.

29.    Goldschmidt failed to inform the Debtor of the entry of the judgment.

*(b) The Appeal.*

30.    On May 16, 2001 Goldschmidt filed a Notice of Appeal in the District of Columbia Court of Appeals. After both sides submitted briefs, the Court of Appeals heard oral arguments on April 22, 2004.

31.    Goldschmidt failed to inform the Debtor of the appeal.

32.     On July 1, 2004, the District of Columbia Court of Appeals affirmed the trial court's entry of the jury verdict against the Debtor. *See Restaurant Equipment and Supply Depot Inc., v. Gutierrez*, 852 A.2d 951 (2004).

33.     Goldschmidt failed to inform the Debtor of the decision of the District of Columbia Court of Appeals affirming the trial court's entry of judgment.

*(c) The Plaintiffs' Motion for Attorneys' Fees.*

34.     Following the Court of Appeals decision, the Plaintiffs in the lawsuit filed a Motion for an Award of Attorney's fees pursuant to D.C. Code Section 1-1501 *et seq.*

35.     Goldschmidt represented the Debtor in opposing the motion for attorney's fees.

36.     On June 17, 2005, the trial court entered an order awarding the Plaintiffs' attorney's fees in the amount of $73,038.99.

37.     Goldschmidt failed to inform the Debtor of the Motion for Attorneys Fees or the entry of the award.

*(d) Goldschmidt's Continuous Representation.*

38.     Goldschmidt continuously represented the Debtor from February 2000, through at least June 17, 2005, the date the trial court entered an award on the Motion for Attorneys Fees.

39.     During the course of the representation, Goldschmidt charged the Debtor at least 70,146.17 in fees.

40.     During the course of the representation, the Debtor fully performed its obligations under the contract with Goldschmidt and paid Goldschmidt at least

$40,487.12 in fees. Of the fees paid by the Debtor to Goldschmidt, it appears that Goldschmidt charged approximately $33,674.80 to correct its own errors.

### COUNT I– BREACH OF CONTRACT

41.    The Trustee incorporates paragraphs 1-40 as if fully set forth herein.

42.    In or about January 2000, Goldschmidt and the Debtor entered into an agreement by the terms of which Goldschmidt agreed to provide legal services to the Debtor, more specifically, defending the Lawsuit, and the Debtor agreed to pay Goldschmidt its fees charged for those services.

43.    The Debtor fully performed under the terms of the agreement by paying Goldschmidt its fees.

44.    Implicit in the contact between Goldschmidt and the Debtor was that Goldschmidt would provide competent and thorough legal services in exchange for the Debtor's payment of legal fees.

45.    Goldschmidt breached his contractual and professional obligations to the Debtor by failing to take appropriate action and by failing to exercise reasonable diligence in defending the Lawsuit.

46.    Goldschmidt further breached his contractual duties by changing the Debtor legal fees for work required to attempt to fix Goldschmidt's errors.

47.    As a proximate result of Goldschmidt's breach, the Debtor has suffered damages including the entry of a judgment against it, and its payment of legal fees to Goldschmidt to correct its own errors, and seeks damages in an amount to be proven at trial.

7

## COUNT II – NEGLIGENCE – BREACH OF FIDUCIARY DUTY

The Trustee incorporates paragraphs 1-47 as if fully set forth herein.

48.     In or about January 2000, Goldschmidt and the Debtor entered into an agreement by the terms of which Goldschmidt agreed to provide legal services to the Debtor, more specifically, defending the Lawsuit, and the Debtor agreed to pay Goldschmidt fees based upon those services.

49.     In executing its duties under the agreement, Goldschmidt owed a fiduciary duty to exercise such reasonable skill, care and diligence as members of the legal profession commonly possess and exercise in similar situations

50.     Goldschmidt breached its fiduciary duty and the standard of care owed to the Debtor for the reasons stated above, including, but not limited to failing to take appropriate action in order to defend the Lawsuit, in violation of the standards reasonably to be expected of a competent practitioner in his profession and in these circumstances, and by those acts and omissions, negligently failed to render proper legal representation to the Debtor.

51.     Goldschmidt's negligence and breaches of duty directly and proximately caused damages to the Debtor, including the entry of a judgment against the Debtor which would not have been entered but for Goldschmidt's negligence and breaches of duty, and the payment of attorneys fees to Goldschmidt, by the Debtor, to correct its own errors.

52.     All of the Defendants are jointly and severally liable to the Debtor for breaches of professional and fiduciary duty owed to the Debtor constituting legal malpractice.

8

WHEREFORE, for the foregoing reasons, the Plaintiff, Bryan S. Ross, Chapter 7 Trustee, requests this Court:

a.    enter judgment in favor of Bryan S. Ross, Trustee, and against the Defendants in an amount sufficient to compensate the Debtor for the damages sustained and to be determined at trial, plus attorneys' fees and interest; and

b.    grant Bryan S. Ross, Trustee, such other and further relief as this Court may deem just equitable and proper.

Dated: February 17, 2006                Respectfully submitted,


                                        STINSON MORRISON HECKER LLP

                                        /s/Michael Tucci
                                        Michael Tucci (#430470)
                                        Christopher Lega (#495023)
                                        Stinson Morrison Hecker LLP
                                        1150 18th Street, N.W., #800
                                        Washington, D.C. 20036
                                        Tel: (202) 785-9100

                                        Attorneys for Chapter 7 Trustee

# EXHIBIT C

Westlaw.

852 A.2d 951
852 A.2d 951
**(Cite as: 852 A.2d 951)**

Page 1

**C**Restaurant Equipment and Supply Depot, Inc. v.
Gutierrez
D.C.,2004.

District of Columbia Court of Appeals.
RESTAURANT EQUIPMENT AND SUPPLY
DEPOT, INC., et. al., Appellants,
v.
Osvaldo GUTIERREZ, et. al., Appellees.
**No. 01-CV-774.**

Argued April 22, 2004.
Decided July 1, 2004.

**Background:** Plaintiff brought action against
defendants, alleging violations of the District of
Columbia Wage and Hour Laws and the District of
Columbia Human Rights Act, in addition to battery.
The Superior Court, Susan R. Winfield, J., entered a
default against defendants for their failure to file an
answer to the complaint, denied defendants' motion
to vacate the entry of default, and, after a jury trial on
damages, entered judgment against defendants.
Defendants appealed.

**Holdings:** The Court of Appeals, Washington,
J., held that:

(1) trial court had authority to enter default
against defendants despite the fact that defendants
had filed a motion to dismiss, and

(2) defendants did not show good cause for
vacating the entry of default.

Affirmed.

West Headnotes

**[1] Federal Courts 170B** ⬤➝1054

170B Federal Courts
   170BXI Courts of District of Columbia
      170BXI(B) Superior Court (Formerly Court
of General Sessions)
         170Bk1052 Procedure
            170Bk1054 k. Pleading. Most Cited
Cases

Trial court had authority, under rule governing the
presentation of defenses, to enter default against
defendants based on their failure to file an answer,
even though defendants had filed a motion to dismiss.
Civil Rules 12(a)(5), 55(a).

**[2] Federal Courts 170B** ⬤➝1054

170B Federal Courts
   170BXI Courts of District of Columbia
      170BXI(B) Superior Court (Formerly Court
of General Sessions)
         170Bk1052 Procedure
            170Bk1054 k. Pleading. Most Cited
Cases

Trial court did not need to consider lesser sanctions
before entering default against defendants for their
failure to file an answer, as the default had not been
entered as a sanction for discovery violation. Civil
Rules 12(a)(5), 37.

**[3] Federal Courts 170B** ⬤➝1054

170B Federal Courts
   170BXI Courts of District of Columbia
      170BXI(B) Superior Court (Formerly Court
of General Sessions)
         170Bk1052 Procedure
            170Bk1054 k. Pleading. Most Cited
Cases

Although the trial court may, in its discretion, enter a
default under rule governing the presentation of
defenses when a party who "otherwise defended"
against the complaint nevertheless fails to comply
with the requirements of the rule, the trial court is
required to enter a default if it finds that a party has
wholly failed to respond to a complaint, either by
pleading or otherwise defending against the
complaint, within the meaning of rule governing
default. Civil Rules 12(a), 55(a).

**[4] Federal Courts 170B** ⬤➝1054

170B Federal Courts
   170BXI Courts of District of Columbia
      170BXI(B) Superior Court (Formerly Court
of General Sessions)
         170Bk1052 Procedure
            170Bk1054 k. Pleading. Most Cited

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Cases
Defendants' explanation that they inadvertently forgot to file answer did not constitute "good cause" for vacating the entry of default, especially in light of the fact that defendants did not file an answer during the three-week period after they became aware of their failure to file an answer. Civil Rule 55(c).

[5] Federal Courts 170B ⬭1052.1

170B Federal Courts
    170BXI Courts of District of Columbia
        170BXI(B) Superior Court (Formerly Court of General Sessions)
            170Bk1052 Procedure
                170Bk1052.1 k. In General. Most Cited Cases
Trial court's discretion in deciding whether to vacate the entry of default is guided by different standards than those used in deciding whether to vacate a default judgment. Civil Rules 55(c), 60(b).

[6] Federal Courts 170B ⬭1052.1

170B Federal Courts
    170BXI Courts of District of Columbia
        170BXI(B) Superior Court (Formerly Court of General Sessions)
            170Bk1052 Procedure
                170Bk1052.1 k. In General. Most Cited Cases
A default entered by the Clerk pursuant to rule governing entry of default is distinct from a default judgment entered pursuant to rule governing entry of default judgment and must be treated separately. Civil Rule 55(a), (b)(2).

[7] Federal Courts 170B ⬭1052.1

170B Federal Courts
    170BXI Courts of District of Columbia
        170BXI(B) Superior Court (Formerly Court of General Sessions)
            170Bk1052 Procedure
                170Bk1052.1 k. In General. Most Cited Cases
Unlike a default judgment, the entry of a default simply precludes the defaulting party from offering any further defense on the issue of liability. Civil Rule 55(a), (b)(2).

[8] Federal Courts 170B ⬭1052.1

170B Federal Courts
    170BXI Courts of District of Columbia
        170BXI(B) Superior Court (Formerly Court of General Sessions)
            170Bk1052 Procedure
                170Bk1052.1 k. In General. Most Cited Cases
A default is interlocutory in nature and operates as an admission by the defaulting party that there are no issues of liability, but leaves the issue of damages unresolved until the entry of judgment. Civil Rule 55(a), (b)(2).

[9] Federal Courts 170B ⬭1052.1

170B Federal Courts
    170BXI Courts of District of Columbia
        170BXI(B) Superior Court (Formerly Court of General Sessions)
            170Bk1052 Procedure
                170Bk1052.1 k. In General. Most Cited Cases
At a minimum, a party seeking to have the entry of default vacated must do two things: (1) establish good cause for vacating the default, and (2) file a verified answer presenting an adequate prima facie defense. Civil Rule 55(c).

[10] Federal Courts 170B ⬭1064

170B Federal Courts
    170BXI Courts of District of Columbia
        170BXI(C) Appellate Jurisdiction and Procedure
            170Bk1064 k. Presentation and Reservation in Lower Court of Grounds of Review. Most Cited Cases
On appeal from trial court's refusal to vacate the entry of default against defendants, Court of Appeals did not need to consider a number of excuses offered by defendants for their failure to file an answer, where those excuses were not properly raised in the trial court. Civil Rule 55(c).

[11] Federal Courts 170B ⬭1066

170B Federal Courts
    170BXI Courts of District of Columbia
        170BXI(C) Appellate Jurisdiction and Procedure
            170Bk1066 k. Scope of Review. Most

852 A.2d 951
852 A.2d 951
**(Cite as: 852 A.2d 951)**

Cited Cases
In determining whether trial court had "good cause"
to vacate the default entered against defendants for
their failure to file an answer, the Court of Appeals
would not consider contents of defendants' allegedly
meritorious defense; governing rule required a
showing of good cause in addition to an answer
setting forth a prima facie defense. Civil Rule 55(c).

**\*952** Tamir D. Damari, with whom Stanley H.
Goldschmidt, Washington, DC, was on the brief, for
appellants.
Leizer Z. Goldsmith, with whom Karen Bower,
Washington, DC, was on the brief, for appellees.

Before RUIZ and WASHINGTON, Associate
Judges, and PRYOR, Senior Judge.

WASHINGTON, Associate J.
The trial court entered a default against
Restaurant Equipment and Supply Depot, Inc., *et. al.,*
("appellants") because they failed to timely file an
answer to appellees' complaint. On appeal from the
subsequently-entered judgment, appellants argue that
the trial court lacked authority to enter the default
under Super. Ct. Civ. R. 55(a) because appellants had
otherwise defended against the plaintiff's claims by
timely filing a motion to dismiss. In addition,
appellants argue that even if the trial court were
empowered to enter the default, the trial court abused
its discretion in not vacating it pursuant to Super. Ct.
Civ. R. 55(c). Because Super. Ct. Civ. R. 12(a)(5)
required the trial court to enter a default in this case,
and because appellants have failed to show good
cause to justify vacating the entry of default, we
affirm.

I.

On February 16, 2000, Osvaldo Gutierrez, *et. al.,*
("appellees") filed a complaint against appellants
alleging, *inter alia,* violations of the District of
Columbia Wage and Hour Laws and the District of
Columbia Human Rights Act, in addition to battery.
On April 17, 2000, two days before the deadline for
appellants' responsive pleading, appellants filed a
request for an extension of time to respond. After an
additional request for enlargement of time to respond,
appellants timely filed their motion to dismiss on
May 5, 2000. Appellees filed an opposition to this
motion on May 24, 2000 and appellants noted a reply
on June 5, 2000.

At the initial status conference held on May 19,
2000, the trial court issued a scheduling order which
set the following **\*953** deadlines: (1) written
discovery requests and exchange of witness lists were
due by July 19, 2000; (2) written discovery responses
were due by August 19, 2000; and (3) discovery
closed on September 19, 2000. In accordance with
the scheduling order, appellees served appellants
their written discovery requests and witness list on
July 19, 2000. Appellants, however, did not comply
with the scheduling order. Instead, they filed a
praecipe to the court on July 19, 2000 indicating that
"since [appellants] have filed a Motion to Dismiss,
which is still pending, it does not make sense to
undertake discovery until this Court rules on the
dispositive Motion." After the trial court's law clerk
informed appellants that the praecipe would not
forestall discovery, appellants commenced the
untimely preparation of written discovery requests
and served same upon appellees on August 4, 2000.
Appellants did not respond to appellees' written
discovery requests by the August 19, 2000 deadline,
nor did appellees respond to appellants' untimely
requests. When discovery ultimately closed on
September 19, 2000, appellants still had not produced
the requested discovery.

In the meantime, the trial court had denied
appellants' motion to dismiss on September 11, 2000,
which triggered appellants' obligation to file an
answer within ten days pursuant to Rule 12.
Appellants did not file an answer within the requisite
time period, nor did they seek additional time to file
their answer. Rather, on September 19, 2000,
appellants filed a motion seeking a sixty-day
extension of the discovery deadline for both parties.
On the same date, appellees filed a motion for
enlargement of time, seeking to extend the discovery
deadline for appellees only. The trial court denied
appellants' motion on October 10, 2000 and
appellees' motion on October 16, 2000. The parties
vigorously litigated the issue of discovery throughout
November.

On December 11, 2000, appellees filed a
praecipe requesting entry of a default judgment
against the appellants under Rule 55(a). On
December 13, 2000, appellees filed a motion for
entry of a default judgment, citing appellants' failure
to file an answer, comply with the scheduling order,
and respond to properly propounded discovery
requests. After reviewing the file and determining

852 A.2d 951
852 A.2d 951
(Cite as: 852 A.2d 951)

Page 4

that there was neither an opposition nor an answer to the complaint in the court file, the trial court entered a default against appellants on January 4, 2001, and scheduled a hearing for *ex parte* proof of damages. In lieu of the *ex parte* hearing, a jury trial on damages was held in April 2001. After the jury returned its verdict in favor of appellees, the trial court entered a judgment against appellants on May 3, 2001.

Prior to the entry of judgment, however, on January 17, 2001, appellants filed a motion to vacate the trial court's entry of default along with a verified answer. In their motion to vacate, appellants attacked the entry of default on two fronts. First, appellants argued that the trial court did not have authority to enter the default under <u>Rule 55(a)</u> because appellants had already noted an appearance in the case by filing numerous motions. Second, appellants argued that they met the requirements for vacating the entry of default under <u>Rule 55(c)</u> which gives the trial court discretion to set aside the entry of default "[f]or good cause shown, and upon the filing of a verified answer setting up a defense sufficient if proved to bar the claim in whole or in part." In order to establish good cause, appellants offered the following explanation for their failure to file an answer:

Firstly, [appellants] respectfully submit that their delay in filing their Answer has not been due to a willful disregard or neglect of this Court's Rules. Between September 11, 2000 and the present,**954 the undersigned has, for lack of a better word, been preoccupied with other aspects of this case, and, as a result, has unfortunately and inadvertently failed to timely file [appellants'] Answer.... In the midst of dealing with all of these [discovery] issues, the undersigned unfortunately failed to realize that the time for [appellants] to file their Answer had expired.

The trial court later explained that it denied this motion "because no answer had been timely filed and because [appellants] failed to address this issue." Additionally, the court clarified that the entry of default was not a discovery sanction, but "an order based upon [appellants'] failure to answer the complaint or to request an extension of time in which to do so."

On January 22, 2001, appellants sought an extension of time to reply to appellees' already-granted default motion, arguing that they had not, in fact, received a copy of that motion until after the trial court had issued its ruling and, therefore, were entitled to additional time to respond. Before the

court had even ruled on their motion for an extension of time, appellants filed an opposition to appellees' motion for entry of default on January 25, 2001. The trial court denied appellants' motion for an extension of time as moot and disregarded the improperly-filed opposition.

Not to be deterred, on March 7, 2001, appellants filed a motion for reconsideration of the trial court's entry of default. In this motion, appellants reiterated that they did not believe the trial court had authority to enter a default for failure to answer where they had already appeared in the case. Additionally, appellants argued that there was good cause to vacate the entry of default (although they did not expressly use the term "good cause" in their motion). First, appellants explained that they had not filed a response to appellees' motion for default because they had not received a copy of the document until three weeks after it was filed. Appellants also attached a letter from their attorney's physician which requested that the attorney be given "latitude" with respect to deadlines as a result of a "stress condition" that had persisted since June 2000.<u>FN1</u> Finally, appellants asserted that appellees would not be prejudiced if the court were to vacate the default because appellees had also caused delays in the case. After the trial court denied their motion for reconsideration and entered a judgment against them, appellants noted the instant appeal.

> FN1. Appellants explained that they had not disclosed this condition earlier because counsel "would like to reserve some modicum of a 'zone of privacy' and did not want to concede that his work habits had to be curtailed."

## II.

[1] Appellants maintain that the trial court abused its discretion both in entering and refusing to vacate the default. In order to determine whether the trial court abused its discretion in entering a default because appellants failed to timely file an answer, we look first to <u>Rule 55(a)</u>. *See* <u>Digital Broadcast Corp. v. Rosenman & Colin, L.L.P., 847 A.2d 384, 388-89 (D.C.2004)</u>. Under <u>Rule 55(a)</u>, the trial court *must* enter a default when a defendant has "failed to plead or otherwise defend." *See id.* at 388; <u>Super. Ct. Civ. R. 55(a)</u>.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Even though appellants concede that they did not timely file an answer, they contend that by filing their motion to dismiss they have "otherwise defend [ed]," thus preventing the court from entering a default. In support of this argument, appellants cite to both legal commentary and case law interpreting <u>Rule 55 of the Federal Rules of Civil Procedure</u>, the model upon which our local rule is based. According to the legal commentary about *955 Federal <u>Rule 55(a)</u>, the phrase "plead or otherwise defend" is interpreted disjunctively so that entry of default is inappropriate where the defendant has *either* properly plead *or* otherwise defended. *See, e.g.,* 10 MOORE'S FEDERAL PRACTICE § 55.10[2] [b] (3d ed. 2004); <u>Fed.R.Civ.P. 55(a)</u>. Citing a number of state and federal cases, appellants ask us to find that their motion to dismiss is evidence of their intent to "otherwise defend," precluding a default under <u>Rule 55(a)</u> for failure to file an answer. *See, e.g., United States v. Caldwell,* No. 3:92-CV-1045-H, 1992 U.S. Dist. LEXIS 2015 (N.D.Tx. Dec. 22, 1992); *Equal Employment Opportunity Comm'n v. Southwest Group Fin., Inc.,* No. H-78-1881, 1980 U.S. Dist. LEXIS 10553 (S.D.Tx. Jan. 25, 1980); <u>*Tapp v. Fowler,* 291 Ark. 309, 724 S.W.2d 176 (1987)</u>; <u>*First Southwestern Fin. Servs. v. Laird,* 882 P.2d 1211 (Wyo.1994)</u>.

[2] If our analysis were controlled solely by considering <u>Rule 55</u>, appellants' argument would be persuasive. However, unlike the state and federal rules involved in the cases cited by appellants, our local rules contain an additional provision that authorized the court to enter a default under the circumstances in this case. The local rule in question is <u>Rule 12(a)(5)</u>, which establishes that any failure to comply with the requirements of <u>Rule 12</u> "shall" result in the entry of a default unless otherwise ordered by the court.[FN2] <u>Super. Ct. Civ. R. 12(a)</u>. In this case, <u>Rule 12(a)</u> required appellants to file an answer "within ten days" after receiving notice that the court had denied their motion to dismiss.[FN3] By not answering the complaint within this ten-day period, appellants failed to comply with the mandates of <u>Rule 12(a)</u>, and therefore the trial court was permitted to enter a default pursuant to <u>Rule 12(a)(5)</u>.[FN4]

> FN2.*See* <u>Super. Ct. Civ. R. 12(a)(5)</u> ("Except where the time to respond to the complaint has been extended as provided in <u>Rule 55(a)</u>, failure to comply with the requirements of this Rule shall result in the entry of a default

by the Clerk or the Court sua sponte unless otherwise ordered by the Court.").

> FN3.<u>Super. Ct. Civ. R. 12(a)</u> provides:
> (a) *When presented.* (1) Unless a different time is prescribed in an applicable statute, a defendant shall serve an answer within 20 days after being served with the summons and complaint.
> * * * * * *
> (4) Unless a different time is fixed by Court order, the service of a motion permitted under this Rule alters these periods of time as follows:
> (A) if the Court denies the motion or postpones its disposition until the trial on the merits, the responsive pleading shall be served within 10 days after notice of the Court's action....

> > FN4. Appellants further argue that the trial court should have considered "lesser sanctions" before entering a default in this case. This argument is without merit because the default was not entered as a sanction in this case. The trial court made it quite clear that the entry of default was a result of appellants' failure to timely answer the complaint, and was not a sanction under <u>Rule 37</u>. Therefore, the trial court did not need to consider lesser sanctions before entering the default. *See generally, <u>Digital Broadcast Corp., 847 A.2d at 388-89</u>.*

[3] Despite the plain language of <u>Rule 12(a)(5)</u> which authorized the entry of default in this case, appellants argue that our holding in <u>*Iannucci v. Pearlstein,* 629 A.2d 555 (D.C.1993)</u>, commands a different result. We disagree. In *Iannucci,* after the defendant filed two answers that were later stricken for various procedural defects, the trial court entered a default against her for failing to answer. Determining that "her failure to file a valid answer constituted a technical rather than an actual failure," *id.* at 558, we held that the defendant was not in default under <u>Rule 12(a)</u>. Here, in contrast to *Iannucci,* appellants'*956 failure to file an answer was not merely "technical." Appellants filed no answer whatsoever. Therefore, the trial court did not abuse its discretion in entering the default against appellants.[FN5]

> > FN5. Although the trial court may, in its discretion, enter a default under <u>Rule 12(a)</u> when a party who has "otherwise defended" against the complaint nevertheless fails to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 6

comply with the requirements of Rule 12, the trial court is *required* to enter a default if it finds that a party has wholly failed to respond to a complaint, either by pleading or otherwise defending against the complaint, within the meaning of Rule 55(a). *See Digital Broadcast Corp., 847 A.2d at 389* (noting that a party defaulted under Rule 55 "has indicated by its behavior that it has no valid defense").

### III.

[4][5][6][7][8][9] Appellants also contend that the trial court abused its discretion in denying their motion to vacate the default entered against them. In this case, where the default was entered solely because appellants failed to answer the complaint, Rule 55(c) sets forth the standard the trial court must apply when deciding whether to vacate the entry of default.[FN6] According to Rule 55(c), the court may set aside a default "[f]or good cause shown, and upon the filing of a verified answer setting up a defense sufficient if proved to bar the claim in whole or in part...."Super Ct. Civ. R. 55(c). Thus, at a minimum, a party seeking to have the entry of default vacated under Rule 55(c) must do two things: (1) establish good cause for vacating the default, and (2) file a verified answer presenting an adequate *prima facie* defense. *See Digital Broadcast Corp., 847 A.2d at 389-90;see also Pelkey v. Endowment for Cmty. Leadership, 841 A.2d 757, 759 (D.C.2004).*

> FN6. In their brief, appellants cite to a number of cases involving the standards applicable to vacating default judgments. These cases are irrelevant here, because we are deciding whether the court should have vacated the entry of default. "A default entered by the Clerk pursuant to Super. Ct. Civ. R. 55(a) is distinct from a default judgment entered pursuant to Super. Ct. Civ. R. 55(b)(2) and must be treated separately." *Clark v. Moler, 418 A.2d 1039, 1042 (D.C.1980)* (citation omitted). Unlike a default judgment, the entry of a default "simply precludes the defaulting party from offering any further defense on the issue of liability." *Lockhart v. Cade, 728 A.2d 65, 68 (D.C.1999)* (citation omitted). A default is interlocutory in nature and "operates as an admission by the defaulting party that there are no issues of liability, but leaves the issue

of damages unresolved until the entry of judgment...."*Id.*(citing 46 AM. JUR. 2D Judgments § 266, at 579 (1994)).

Different standards, therefore, govern the trial court's discretion in deciding whether to vacate the entry of default as opposed to a default judgment. We have said that the standard for vacating entry of default is more lenient than the standard for vacating a default judgment which "can be set aside only under the stricter rule 60(b) standards for setting aside final, appealable orders." *Miranda v. Contreras, 754 A.2d 277, 280 n. 4 (D.C.2000)* (citation omitted). This does not mean, however, that the standards are interchangeable. Different factors are considered under Rule 60(b) and Rule 55(c). For instance, when vacating a default judgment under Rule 60(b), the court considers whether the moving party "(1) received actual notice of the proceeding; (2) acted in good faith; (3) presented a prima facie adequate defense; and (4) acted promptly upon discovery of the judgment." *Clark, supra, 418 A.2d at 1043.* Additionally, the court considers whether the non-moving party would suffer any prejudice as a result of the judgment being vacated. *Id.* In contrast, a trial court may vacate the entry of default under Super Ct. Civ. R. 55(c) for "good cause shown, and upon the filing of a verified answer setting up a defense sufficient if proved to bar the claim in whole or in part."

[10][11] Although we have not squarely defined "good cause," our cases establish that good cause is to be determined "in the light of the circumstances of each case." *Leiken v. Wilson, 445 A.2d 993, 1000 (D.C.1982).* In making that determination, this court has always found the moving party's *957 reasons for failing to plead or otherwise defend to be a key consideration. *See Digital Broadcast Corp., 847 A.2d at 389.* Here, appellants have said that their primary reason for failing to file an answer was that they inadvertently "forgot" to file it.[FN7] To accept such an excuse as "good cause" for vacating an entry of default, however, would "negate the meaning of the words." *Morgan v. Barry, 785 F.Supp. 187, 198 (D.D.C.1992).* Regardless, appellants conceded at oral argument that they were *aware* of their failure to file the answer as early as December 15, 2000, and had received a copy of appellees' praecipe around the same time, nearly three weeks before the trial court entered the default. Therefore, "inadvertence" cannot explain appellants' failure to file an answer during this period of time.[FN8] Because appellants simply have not shown good cause for vacating the default,

852 A.2d 951
852 A.2d 951
**(Cite as: 852 A.2d 951)**

Page 7

we are satisfied that the trial court did not abuse its discretion in denying appellants' motion.

> FN7. Appellants claim that counsel's "stress condition" somehow contributed to their failure to file an answer; however, they are unable to explain exactly how the two are causally related. In addition, appellants present a number of excuses for their failure to file an answer that were not presented to the trial court, including: (1) they were short-staffed because one of their associates left the firm during the litigation, (2) they inadvertently failed to "calendar" the due date for the answer, (3) appellees failed to notify them that their answer was delinquent between September 29, 2000 and December 11, 2000, (4) they forgot about the answer during the long pendency of their motion to dismiss, and (5) they were unable to contact their clients during the holiday season and were unable to finish the answer. We need not consider these excuses, however, because they were not properly raised in the trial court. *See Pelkey, supra,* 841 A.2d at 760 n. 3 (citations omitted).

> FN8. Appellants have suggested that we should consider their allegedly meritorious defense in our assessment of whether the trial court had "good cause" to vacate the default. Because this court has interpreted Rule 55(c) as requiring a showing of good cause in *addition* to an answer setting forth a *prima facie* defense, *see Digital Broadcast Corp.,* 847 A.2d at 389-90, we do not consider the contents of appellants' defense in our evaluation of "good cause."

*Affirmed.*

D.C.,2004.
Restaurant Equipment and Supply Depot, Inc. v. Gutierrez
852 A.2d 951

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Bryan S. Ross, Chapter 7 Trustee )<br><br>      Plaintiff, )<br><br>v.         )<br><br>Continental Casualty Company )<br><br>      Defendant. ) | Case:  1:07-CV-01450<br><br>Assigned to:  Roberts, Richard W.<br><br>Assign Date:  8/10/2007<br><br>Description:  Contract |

### [PROPOSED] ORDER

Upon consideration of Defendant Continental Casualty Company's Motion for Judgment on the Pleadings, or in the Alternative, Motion for Summary Judgment, filed on January 30, 2008, it is this _____ day of _____, 2008, hereby

**ORDERED** that, Defendant Continental Casualty Company's Motion for Judgment on the Pleadings, or in the Alternative, Motion for Summary Judgment, is hereby **GRANTED**, and Continental Casualty Company has no obligation to defend or indemnify Stanley H. Goldschmidt ("Goldschmidt") or the Law Offices of Stanley H. Goldschmidt (the "Firm") in connection with the applicable policy of insurance, or pay any part of the settlement reached in connection with the malpractice lawsuit filed by the Plaintiff Trustee against the Firm and Goldschmidt.

_____
Judge Richard W. Roberts

363529v1

Copies to:

Richard A. Simpson
Kelly V. Overman
Ross, Dixon & Bell, LLP
2001 K Street, N.W.
Washington, D.C.  20006

Michael E. Tucci
Darrell W. Clark
Jaime Dibble
Stinson Morrison Hecker, LLP
1150 18th Street, N.W., Suite 800
Washington, D.C.  20036